**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action |
| | : | File No.: ____________________ |
| GENERAL MILLS, INC., | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT

CSX Transportation, Inc. ("CSX"), Plaintiff in the above-styled civil action, files this complaint against Defendant General Mills, Inc. ("General Mills") showing the Court as follows:

## PARTIES, JURISDICTION, AND VENUE

1. CSX is a corporation incorporated under the laws of the State of Virginia and having its principal place of business in the State of Florida.

2. General Mills is a corporation incorporated under the laws of the State of Delaware and having its principal place of business in the State of Minnesota. General Mills transacts business within the State of Georgia and owns, uses, and possesses real property within the State of Georgia. General Mills has purposely directed activities at residents of the State of Georgia, and this litigation arises out

of those activities. General Mills has continuous and systematic general business contacts within the State of Georgia. Therefore, General Mills is subject to the jurisdiction of this Court. *See* O.C.G.A. § 9-10-91; U.S. Const. amend. XIV.

3. The matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.00, and there is complete diversity of citizenship between CSX and General Mills, and, therefore, this action is within this Court's jurisdiction pursuant to 28 U.S.C. § 1332.

4. Pursuant to 28 U.S.C. §1391, venue is proper in this Court because the incident forming the basis of this action occurred in Newton County, Georgia, which is within the Atlanta Division of the United States District Court for the Northern District of Georgia.

## BACKGROUND AND FACTUAL INFORMATION

5. CSX is a Class 1 freight railroad providing rail transportation services in and around Covington, Georgia and serving General Mills using a sidetrack, which extends onto the property of General Mills.

6. General Mills maintains a cereal processing plant in Covington, Georgia, which receives rail service from CSX.

7. On and effective February 9, 1989, CSX and General Mills entered into a Private Sidetrack Agreement (hereinafter referred to as the "Sidetrack

Agreement"). A true and correct copy of the Sidetrack Agreement is attached hereto and incorporated herein as **Exhibit A**.

8. As explained in Section 1, the purpose of the Sidetrack Agreement is to detail the provisions of the construction, maintenance, and use of a private sidetrack for the tender and receipt of rail freight traffic for General Mills. A sidetrack is a railroad track that is connected to the main track, and used by the railroads and its customers for delivering, picking-up, or storing railcars that contain a customer's freight or have been unloaded.

9. Section 11.1 of the Sidetrack Agreement generally sets forth the parties respective indemnification rights and obligations and expressly recognizes that its applicability is limited as otherwise provided for in the Sidetrack Agreement.

10. Section 15 of the Sidetrack Agreement grants General Mills the right to conduct "switching" on its portion of the private sidetrack. "Switching" refers to the process of moving railcars that have been previously delivered by a train or assembling railcars in the proper order so that they can be coupled to a locomotive and pulled out of a customer's facility. Generally, switching involves moving railcars short distances often between divergent rail tracks.

11. Normally, the switching of railcars would be conducted by CSX, using its own locomotive power or trackmobile and its highly-skilled railroad work force.

12. Here, however, General Mills required the ability to conduct its own switching operations over its section of the private sidetrack. And, in connection with General Mills's right to conduct switching over a portion of the track, the Sidetrack Agreement provides, in Section 15 as follows:

> Industry shall have the right to switch with its own Trackmobile or locomotive power over Industry's Segment of the Sidetrack. In no event shall Industry perform any switching service or operate over Railroad's Segment of the Sidetrack.

Exhibit A at § 15.1

13. Since CSX would not be conducting all of the switching operations for General Mills, did not train General Mills's employees, and was not responsible for those switching operations conducted by General Mills, the parties provided for a specific indemnity, separate from Section 11, in Section 15, as follows:

> Further, in consideration therefor, Industry assumes <u>all</u> risk of loss, damage, cost, liability, judgment and expense, (including attorneys' fees) in connection with <u>any</u> personal injury to or death of any persons, or loss of or damage to any property, whether employees of either Industry or Railroad or third persons, or property of either Industry or Railroad or of other persons, that may be sustained or incurred in connection with, or arising from or growing out of, the

> operation of Industry's Trackmobile or locomotive power upon said Sidetrack.

Exhibit A at § 15.1 (emphasis in original).

14. Section 11.2 of the Sidetrack Agreement provides:

> Industry, at its sole cost and expense, must procure and maintain in effect during the continuance of this Agreement, a policy of Commercial General Liability Insurance insuring liability assumed or contracted under this Agreement with a limit of not less than $3,000,000 Combined Single Limit for personal injury and property damage per occurrence.

Exhibit A at § 11.2. The risk of loss assumed by General Mills under Section 15 is, upon information and belief, covered by the policies of insurance purchased pursuant to Section 11.2, which provide total coverage of approximately $25 million.

15. Under Section 3 of the Sidetrack Agreement, General Mills agreed "at its sole expense to comply with all governmental regulations . . . necessary for the construction, maintenance, and use of the sidetrack." Moreover, General Mills agreed to "assume the cost of [CSX's] defense and to otherwise indemnify and hold [CSX] harmless for [General Mills] failure to have or to comply with the Governmental Requirement(s)."

16. In order to conduct switching, General Mills purchased a trackmobile to move railcars within the General Mills facility utilizing General Mills

employees. A trackmobile is a mobile railcar mover, capable of traveling on both roads and railroad tracks, fitted with couplers for moving small numbers of railcars.

17. The General Mills trackmobile was capable of riding on the railroad tracks, coupling to railcars, physically pushing or pulling the railcars to different locations, and then being uncoupled from the railcars once the railcars have been moved and secured in place by the General Mills employees.

18. The General Mills trackmobile was purchased in or about 2003, from Barloworld. In addition to the sale, Barloworld was contracted to provide General Mills employees with precise training on the safe and proper operation of a trackmobile in the General Mills facility, which required both classroom instruction and hands on demonstration.

19. The Barloworld training and the trackmobile manual required, among other things, that chocks be utilized at all times on any railcars not coupled to the trackmobile or other locomotive power, and particularly when cars would be left unattended, unconnected, or uncoupled on a grade or incline.

20. During the Barloworld training and certification required to operate the trackmobile, General Mills, through certain of its selected employees, was instructed to chock the descending end wheels of railcars parked on an incline and

on unattended railcars to prevent them from rolling. General Mills employees, including employee Doug Burchfield, were also instructed that individuals who were not properly trained, both with in-classroom instruction and hands-on demonstration, were not to operate the trackmobile.

21. Years after General Mills purchased a trackmobile to conduct its own switching operations, on June 5, 2005, General Mills employee Doug Burchfield sustained significant personal injury, including partial amputation of both legs, while in the course of using the General Mills trackmobile to conduct industry switching on General Mills' segment of the sidetrack at the General Mills facility in Covington, Georgia.

22. At the time of the incident, Mr. Burchfield and fellow General Mills employee, Rodney Turk, were switching various railcars on the General Mills segment of the private sidetrack, including a 286,000 pound loaded railcar (hereinafter referred to as "AEX 7136").

23. AEX 7136 is owned by The Andersons, Inc. ("The Andersons"), an agriculture company that, among other things, owns, manages, and leases railcars to other companies. In 2001, The Andersons made significant renovations to AEX 7136 to increase the volume and weight of product that AEX 7136 could legally and safely contain and haul. As part of that renovation, under various laws and

regulations, The Andersons was required to change the handbrake on AEX 7136 from a Group N handbrake to a Group O handbrake. Despite representing to governmental authorities that it had made this upgrade in the handbrake, The Andersons failed to do so, and AEX 7136 still had an improper Group N handbrake at the time of the incident. CSX was not involved in any of these renovations or upgrades to AEX 7136.

24. The Andersons leased AEX 7136 to Star of the West Milling Company ("Star of the West"), an agriculture company based in Frankenmuth, Michigan. Prior to the incident, AEX 7136 was loaded with food grain clean wheat at Star of the West's facility in Michigan to be shipped to General Mills's facility in Covington. While CSX eventually delivered AEX 7136 to Covington, AEX 7136 first traveled via other rail carrier(s). These other rail carriers had a duty to inspect AEX 7136, including AEX 7136's handbrake. Additionally, in the weeks and months prior to the incident, before being used to haul wheat from Michigan to General Mills's facility in Covington, AEX 7136 had been used for other shipments. At times during these prior shipments, AEX 7136 traveled via rail carriers other than CSX. These carriers had the duty to inspect AEX 7136, including AEX 7136's handbrake.

25. At the time of the incident, the private sidetrack consisted of four separate tracks that split from the main track after it entered General Mills's property. Three of the tracks were used by General Mills to hold railcars, while the other track traveled into a covered building where General Mills employees unloaded cars for General Mills's cereal making operations.

26. On the date of the incident, Mr. Burchfield and Mr. Turk used the trackmobile to move AEX 7136 around the Sidetrack and from one track to an adjacent holding track. Throughout these movements, Mr. Turk operated the trackmobile. Mr. Turk had received little, if any, training regarding the use of the trackmobile and switching operations and was not qualified by any measure to operate the trackmobile.

27. After Mr. Turk placed AEX 7136 on the holding track, uncoupled it from the trackmobile, and drove the trackmobile away from AEX 7136, Mr. Turk observed movement by AEX 7136. After AEX 7136 was observed to move, neither Mr. Burchfield nor Mr. Turk, in performing their duties as General Mills's employees, rechecked the handbrake, chocked the wheels, performed a "push-pull" test, or took any other action to verify that it was secured safely in place.

28. Mr. Burchfield and Mr. Turk traveled in the trackmobile to an adjoining track for further switching operations, passing over an unapplied manual

derail device. Neither Mr. Burchfield nor Mr. Turk engaged the manual derail device. This would have prevented AEX 7136 from rolling down the track upon which it had been placed, which ultimately happened.

29. Mr. Burchfield and Mr. Turk proceeded, while in the trackmobile, to move an empty railcar on a portion of the sidetrack downhill from and directly below the location of AEX 7136. Mr. Turk continued to operate the trackmobile throughout these movements. It was then, while Mr. Burchfield was out of the trackmobile, that AEX 7136 rolled down the track and impacted with the trackmobile and attached empty railcar. The empty railcar, AEX 7136, and the trackmobile were pushed through a "split-rail" derailer device, causing the empty railcar and the trackmobile to completely derail and AEX 7136 to partially derail, as its front end wheels also traveled through the "split-rail" derailer device.

30. As a result of the collision, the empty railcar, the trackmobile, and AEX 7136 ran over Mr. Burchfield, and he sustained significant personal injuries. The injuries to Mr. Burchfield were sustained in connection with, or arising from, or occurring out of, the operation of General Mills's trackmobile upon General Mills's segment of the private sidetrack located at the General Mills facility.

31. In its post-accident investigation, General Mills determined that: (i) the loaded railcar AEX 7136's handbrake was not in the set, or applied, position

after the incident; (ii) no one, including his co-worker Mr. Turk, had observed Mr. Burchfield set the handbrake on AEX 7136 when it was uncoupled from the trackmobile; (iii) no chocks had been applied on AEX 7136 even though it was unattended, unconnected, and uncoupled alone on a grade; and (iv) the manual derail device had not been applied by Mr. Burchfield or Mr. Turk.

32. In its post-accident investigation, General Mills retained Rail Sciences, Inc. and its President, Gary Wolf. Mr. Wolf performed various tests for General Mills on the loaded railcar including tests of the brake shoes, handbrake mechanism, and ability of AEX 7136 to be held in place by application of the railcar's handbrake. Mr. Wolf determined there was no defect in the condition or operating ability of the handbrake on AEX 7136.

33. In its post-accident investigation, General Mills also retained Mr. Mo Draper, an employee of Barloworld. Mr. Draper's particular area of expertise is trackmobile operations. Mr. Draper was present for and participated in the various experimental tests performed by Mr. Wolf.

34. Based upon its own investigation, General Mills failed to: (i) properly train its employees in industry switching and trackmobile operation, (ii) provide required chocks on the trackmobile, (iii) prevent untrained and uncertified individuals from operating the trackmobile and participating in industry switching,

(iv) employ individuals with expertise in railcar switching operations to supervise, oversee, and conduct such operations, (v) establish policies and procedures for the inspection of railcars on its property and in its custody and control, (vi) monitor the activities of its employees in switching operations, (vii) provide required safety equipment, and (viii) enforce and actively disregarded its own safety policies regarding switching, chocking, derails, switching certification, and handbrake efficiency testing.

35. Pursuant to the Sidetrack Agreement, CSX did not train, oversee, or conduct any of the switching operations conducted by General Mills on the General Mills portion of the private sidetrack.

36. At the time of the incident, both Mr. Burchfield and Mr. Turk were: (i) employed by General Mills, or one of its subsidiaries, (ii) performing their duties as employees of General Mills, or one of its subsidiaries, and (iii) acting within the course and scope of their employment at General Mills, or one of its subsidiaries. Also, in his capacity as a General Mills employee and while acting within the scope of his employment, Mr. Turk operated the trackmobile, even though Mr. Turk had not undergone the requisite training and was not certified to operate the trackmobile, and Mr. Burchfield, in the scope of his employment with General Mills, permitted Mr. Turk to do so. Mr. Turk, in the scope of his

employment with General Mills, continued with switching operations below AEX 7136, despite having seen the railcar move after it was uncoupled from the trackmobile. Mr. Turk and Mr. Burchfield, in the scope of their respective employment with General Mills, conducted switching operations downgrade from AEX 7136 without taking any precautions, such as setting derailers or chocking the railcar. As such, General Mills is responsible for the conduct of Mr. Burchfield and Mr. Turk on June 5, 2005, and the consequences thereof.

37. Mr. Burchfield received workers compensation for his injuries, and General Mills is immune from a damages claim from Mr. Burchfield for his injuries as a result of Georgia workers compensation laws.

**PROCEDURAL HISTORY AND STATUS**

38. On June 1, 2007, Doug Burchfield instituted a personal injury action against CSX and The Andersons in the United States District Court for the Northern District of Georgia, Civil Action No. 1:07-cv-1263 (TWT) (hereinafter referred to as the "Burchfield lawsuit"). The Andersons subsequently brought a third party claim for contribution and indemnification against Star of the West.

39. On June 18, 2007, CSX tendered the defense of the Burchfield lawsuit to General Mills. A true and correct copy of the June 18, 2007, tender of the defense letter is attached hereto and incorporated herein as **Exhibit B**. By letter

dated June 29, 2007, General Mills refused CSX's tender of defense. A true and correct copy of the June 29, 2007, refusal of defense letter is attached hereto and incorporated herein as **Exhibit C**.

40. Despite the fact that General Mills's own internal analyses by two separate experts determined that the cause of the accident was a result of General Mills's employees' failure to properly engage the handbrake, to chock the wheels of railcar AEX 7136, and/or engage the manual derailer devise, and that CSX was not responsible for the incident, General Mills, ignoring its obligations under Section 15 of the Sidetrack Agreement, continues to deny CSX indemnification.

41. Worse yet, General Mills, through its counsel, informed counsel for CSX that the information obtained by and prepared for General Mills during the post-accident investigation conducted by Mr. Wolf and Mr. Draper would not be shared with CSX for use in its defense of the Burchfield matter, unless CSX agreed to waive its right to indemnification from General Mills.

42. General Mills was not a party to the Burchfield lawsuit and refused to cooperate in good faith with CSX in its defense. In fact, General Mills only made limited appearances in the Burchfield lawsuit to object and refuse to allow CSX to obtain and introduce any oral and/or written testimony by Mr. Wolf or Mr. Draper as to the efficient operation of the hand brake, the failures of General Mills

employees to follow its own procedures, and/or the tests performed post-accident that demonstrated that the handbrake on AEX 7136 was free from defect and worked efficiently.

43. Prior to trial, Mr. Burchfield settled his negligence claims against The Andersons for a settlement amount that was not disclosed.

44. The Burchfield lawsuit resulted in a jury trial verdict in favor of CSX on October 15, 2009, which was reversed by the United States Court of Appeals for the Eleventh Circuit on June 1, 2011.

45. A retrial of the Burchfield lawsuit commenced on April 9, 2012, resulting in a jury verdict in favor of Burchfield, in the amount of twenty million, five hundred-fifty nine thousand and four dollars ($20,559,004.00).

46. On June 26, 2012, CSX made a demand for indemnification from General Mills for the full amount of the jury verdict. A true and correct copy of the June 26, 2012, demand for indemnification is attached hereto and incorporated herein as **Exhibit D**.

47. On April 17, 2013, the jury verdict became a Final Judgment after the disposition of post-trial motions, and Burchfield filed a Notice of Appeal in the United States Court of Appeals for the Eleventh Circuit. CSX filed its own Notice

of Appeal in the United States Court of Appeals for the Eleventh Circuit on May 6, 2013.

48. On May 20, 2013, General Mills rejected CSX's demand for indemnification as the Burchfield lawsuit was "not fully resolved" and stated that CSX's demand was "premature." A true and correct copy of the May 20, 2013, response from General Mills is attached hereto and incorporated herein as **Exhibit E**.

49. On May 30, 2013, CSX again demanded indemnification from General Mills and invited General Mills to participate in mediation, required as part of the United States District Court of Appeals for the Eleventh Circuit appellate process, between Burchfield and CSX. A copy of the May 30, 2013, demand for indemnification is attached hereto and incorporated herein as **Exhibit F**. General Mills refused.

50. As a result of the court-ordered mediation, CSX and Burchfield reached a settlement of the Burchfield lawsuit, requiring CSX to remit sixteen million dollars ($16,000,000.00) to Burchfield. CSX has tendered full payment to Burchfield.

51. On August 28, 2013, following the tender of payment to Burchfield, CSX again demanded payment from General Mills, as indemnitor under the

Private Sidetrack Agreement. A copy of the August 28, 2013, demand for indemnification is attached hereto and incorporated herein as **Exhibit G**.

52. By letter dated September 26, 2013, General Mills again refused to uphold its contractual indemnification obligation to CSX. A copy of the September 26, 2013, letter refusing indemnification is attached hereto and incorporated herein as **Exhibit H**.

53. CSX incurred significant costs, fees, and expenses in defending the Burchfield lawsuit and has incurred and continues to incur costs, fees, and expenses in prosecuting this action.

**COUNT I**

**CONTRACTUAL INDEMNITY, SECTION 15**

54. CSX repeats, realleges, and incorporates by reference the allegations of paragraphs 1 through 53 of this complaint, as if fully set forth herein.

55. Pursuant to Section 15 the Sidetrack Agreement, General Mills agreed to assume

> all risk of loss, damage, cost, liability, judgment and expense, (including attorneys' fees) in connection with any personal injury to or death of any persons, or loss of or damage to any property, whether employees of either Industry or Railroad or third persons, or property of either Industry or Railroad or of other persons, that may be sustained or incurred in connection with, or arising from or growing out of, the operation of Industry's Trackmobile or locomotive power upon said Sidetrack.

Exhibit A at § 15.1 (emphasis in original).

56. Section 15 of the Sidetrack Agreement—unlike Section 11's general allocation of liability for a broad-range of possible occurrences—specifically covers all risk of loss, irrespective of cause, in connection with any incident arising out of General Mills's use of its own trackmobile, and requires General Mills to indemnify CSX without regard to who ultimately was determined to be at fault. Mr. Burchfield's injuries were incurred in connection with and/or arising from the operation of General Mills's trackmobile over the General Mills portion of the private sidetrack.

57. The Burchfield lawsuit arose directly out of General Mills's operation of its trackmobile upon the sidetrack and resulted in a jury verdict entered against CSX in the amount of twenty million, five hundred-fifty nine thousand and four dollars ($20,559,004.00).

58. Throughout the trial, retrial, and court-ordered mediation, CSX provided notice to General Mills and afforded General Mills every opportunity to participate in the matter. General Mills refused to participate and/or cooperate in good faith with the defense of the claim.

59. Following court-ordered mediation, Burchfield and CSX agreed to a settlement of the Burchfield lawsuit in the amount of sixteen million dollars

($16,000,000.00). CSX is entitled to indemnification from General Mills for such loss, damage, cost, liability, judgment, and expense, including attorneys' fees, incurred in the Burchfield lawsuit as well as all costs, fees, and expenses incurred in prosecution of this lawsuit.

60. CSX demanded indemnification from General Mills by letters dated June 18, 2007, June 26, 2012, May 30, 2013 and August 28, 2013, for all of its losses, damages, liability, judgment, and expenses, including attorneys' fees, in the Burchfield lawsuit.

61. General Mills failed and refused to indemnify and hold harmless CSX in this matter and, therefore, General Mills has breached Section 15 of the Private Sidetrack Agreement.

62. As a direct result and consequence of General Mills's breach of Section 15 of the Private Sidetrack Agreement, CSX has suffered damages.

**COUNT II**

**CONTRACTUAL INDEMNITY, SECTION 3**

63. CSX repeats, realleges, and incorporates by reference, the allegations of paragraphs 1 through 62 of this complaint, as if fully set forth herein.

64. Pursuant to Section 3 the Sidetrack Agreement, General Mills agreed "at its sole expense to comply with all governmental regulations . . . necessary for

the construction, maintenance, and use of the sidetrack." Moreover, General Mills agreed to "assume the cost of [CSX's] defense and to otherwise indemnify and hold [CSX] harmless for [General Mills] failure to have or to comply with the Governmental Requirement(s)."

65. General Mills breached Section 3 of the Sidetrack Agreement, as it failed to comply with all governmental regulations necessary for the construction, maintenance, and use of the sidetrack.

66. General Mills's regulatory and statutory violations include, but are not limited to, violation of 29 U.S.C. § 654(a)(1). As set forth in paragraph 34 above, General Mills failed in several respects to provide Mr. Burchfield employment and a place of employment that were free from recognized hazards that caused and were likely to cause death or serious physical harm. *See* 29 U.S.C. § 654(a)(1). General Mills failed to render Mr. Burchfield's workplace free of preventable and recognized hazards that caused Mr. Burchfield serious physical injury.

67. General Mills's regulatory and statutory violations include, but are not limited to, a violation of 29 C.F.R. § 1910.176(f), which provides that "[d]erail and/or bumper blocks shall be provided on spur railroad tracks where a rolling car could contact other cars being worked, enter a building, work or traffic area."

General Mills failed to provide bumper blocks and sufficient derail devices on the sidetrack and failed to properly train its employees in the use of same.

68. General Mills's regulatory and statutory violations caused, contributed to, and resulted in Mr. Burchfield's injuries which were at issue in the Burchfield lawsuit.

69. General Mills was required under Section 3 of the Sidetrack Agreement to assume the cost of defense of the Burchfield lawsuit and to otherwise indemnify CSX and hold CSX harmless for all damages, costs, and expenses resulting from the Burchfield lawsuit.

70. As set forth in detail above, CSX repeatedly tendered the defense of the Burchfield lawsuit to General Mills and demanded indemnification from General Mills for all of CSX's losses, damages, liability, judgment, and expenses, including attorneys' fees, in the Burchfield lawsuit.

71. General Mills failed and refused to assume the cost of defense and to indemnify and hold harmless CSX in this matter and, therefore, General Mills has breached Section 3 of the Private Sidetrack Agreement.

72. As a direct result and consequence of General Mills's breaches of Section 3 of the Private Sidetrack Agreement, CSX has suffered damages.

73. Due to General Mills's breach of Section 3 of the Sidetrack Agreement, CSX is entitled to recover indemnification from General Mills for all loss, damage, cost, liability, judgment, and expense, (including attorneys' fees), incurred in the Burchfield lawsuit as well as all costs, fees, and expenses incurred in prosecution of this lawsuit.

**WHEREFORE**, CSX respectfully prays that the Court take the following action in this matter:

a. That judgment be entered in favor of CSX and against General Mills on all claims asserted herein with costs and fees charged to General Mills;

b. That CSX recover indemnification from General Mills for any and all losses, damages, costs, liabilities, judgment, and expenses, including attorneys' fees, incurred in the Burchfield lawsuit, as well as all costs, fees, and expenses incurred in prosecution of this lawsuit;

c. That CSX recover from General Mills all available damages due to General Mills's breaches of the Sidetrack Agreement;

d. That CSX be awarded its expenses of litigation, including reasonable attorneys' fees and costs, pursuant to O.C.G.A. § 13-6-11, due to the bad faith and stubborn litigiousness of General Mills;

e. That CSX be awarded prejudgment interest from the date of General Mills's breach to the date of judgment, pursuant to O.C.G.A. § 13-6-13; and

f. That the Court grant further relief in favor of CSX and against General Mills that the Court deems proper and just.

Respectfully submitted this 23rd day of January, 2014.

GUNSTER, YOAKLEY & STEWART, P.A.

By: */s/ Ana Johnson*
Ana Johnson, GA Bar No. 240127
ajohnson@gunster.com
225 Water Street, Suite 1750
Jacksonville, Florida 32202-5185
(904) 350-7175

THE JORDAN FIRM

By: */s/ Randall A. Jordan*
Randall A. Jordan, GA Bar No. 404975
rjordan@ jordanfirmlaw.com
Grant C. Buckley, GA Bar No. 092802
gbuckley@ jordanfirmlaw.com
Karen Jenkins Young, GA Bar No. 390810
kyoung@jordanfirmlaw.com
Christopher R. Jordan, GA Bar No. 092802
cjordan@ jordanfirmlaw.com
R. Stan Baker, GA Bar No. 141654
sbaker@ jordanfirmlaw.com
1804 Frederica Road, Suite C
Saint Simons Island, Georgia 31522
Phone: (912) 638-0505

JAX_ACTIVE 3381058.6

# EXHIBIT A

CSX-8598

FORM CSX 1550
Rev. 10/88
RE-90258
PS\0190401AI.JFY

# PRIVATE SIDETRACK AGREEMENT

Number One General Mills

THIS PRIVATE SIDETRACK AGREEMENT (hereinafter "Agreement"), made and effective this 9th day of February, 1989, is by and between CSX TRANSPORTATION, INC. (hereinafter "Railroad"), whose mailing address is: 500 Water Street, Jacksonville, FL 32202; Attention: Property Services Department (J-180); and GENERAL MILLS, INC., a Delaware corporation (hereinafter "Industry"), whose mailing address is: ~~9200 Wayzata~~ Blvd., Minneapolis, Minnesota 55426.

Initial

1. **PURPOSE**

The purpose of this Agreement is to detail the provisions of the construction, maintenance ~~and use of~~ a private sidetrack for the tender and receipt of rail freight traffic for the account of Industry. The private sidetrack, which consists of the track structure (Rails, ties and fastenings), ballast, grading, drainage structure, turnout, bumping post and other appurtenances, (hereinafter the "Sidetrack"), is located at or near COVINGTON in the County of NEWTON, State of GEORGIA, as shown on the attached Plan No. C-102, dated November 15, 1988 and last revised as of November 30, 1988 (hereinafter the "Plan").

2. **OWNERSHIP AND CONSTRUCTION:**

2.1 Industry agrees to construct that portion of Track No. 127-1, between Track Station 1+50 and Track Station 5+20 and the entire length of Track Nos. 127-1, 127-1A and 127-1B. Actual cost of constructing the portion of Track No. 127-1, above sub-ballast, between Station 0+00 and 1+50, shall be subject to refund under terms of Article 2.8. Railroad agrees to construct that portion of Track No. 127-1 from point of switch (P.S) Track Station No. 0+00 to Track Station No. 1+50.

2.2 The construction of the Sidetrack shall be done in accordance with the provisions of the Railroad's document entitled "Specifications for Industrial Tracks", as amended, supplemented or superseded (hereinafter the "Specifications"), which details the design, construction, clearance and similar requirements regarding the Sidetrack. Industry acknowledges receipt of a current copy of the Specifications, which are incorporated herein by reference.

2.3 Upon completion of construction, Railroad shall own that portion of Track 127-1 from point of switch (P.S.) Track Station No. 0+00 to Track Station No. 1+50, and upon completion of construction and acceptance by Railroad, Industry shall donatively convey and Railroad shall own that portion of Track No. 127-1 from Track Station No. 1+50 to Track Station No. 5+20 ownership point (O.P.), with Railroad trackage ownership shown in Red on print attached (hereinafter "Railroad's Segment"); remainder of trackage from O.P. to end, as shown in Green shall be owned by Industry (hereinafter "Industry's Segment").

2.4 Industry shall provide Railroad with all plans and specifications for construction of said Sidetrack to review prior to commencement of construction. Any modification or change Railroad requires in said plans shall be made, and any resultant increases in cost shall be assumed by Industry.

2.5 Industry, at its sole cost and expense, shall: (i) perform all grading, drainage and erosion control work for the entire Sidetrack; (ii) furnish and place sub-ballast for entire Sidetrack; (iii) furnish all labor and material for that portion of the Sidetrack that Industry is to construct, as described in Section 2.1; and (iv) install suitable bumping post at stub end of track.

2.6 If Industry fails to perform its work provided herein and Railroad performs same for Industry, or if Railroad at the request of Industry performs any other work in connection with the Sidetrack not provided for herein, Industry shall promptly pay to Railroad the cost thereof upon receipt of Railroad's bill therefor. Such work shall not be eligible for refund.

CSX-8532

2.7 Industry shall bear any and all expenses of reconstruction of said Sidetrack necessitated by reason of failure of Industry or its contractor to adhere to construction plans approved by Railroad or the Specifications.

2.8 To amortize the cost of construction and maintenance of Railroad's Segment and any signals, communication facilities, derail or other modifications to Railroad's connecting mainline track, Industry guarantees, unless the Agreement is terminated by the actions of Railroad, to tender or receive a minimum of THIRTEEN HUNDRED (1,300) loaded railcars of freight over the Sidetrack during a five (5) year term (hereinafter the "Guarantee Period"), computed from the date the Sidetrack is approved for service by Railroad. To qualify under this section, a railcar must generate a minimum of THREE HUNDRED U.S. DOLLARS ($300.00) of roadhaul revenue to Railroad. If the guarantee is not met, or if the Agreement is terminated during the Guarantee Period due to a default of Industry, then Industry agrees to pay Railroad, as liquidated damages and without demand, the sum of NINETY U.S. DOLLARS ($90.00) times the number of deficit railcars within thirty (30) days after the end of the Guarantee Period or the date of default, as appropriate.

3. GOVERNMENTAL REQUIREMENT(S):

3.1 Industry agrees, at its sole expense, to comply with all governmental regulations and to obtain all necessary governmental permits, authorizations, orders and approvals (hereinafter collectively "Governmental Requirement(s)") necessary for the construction, maintenance and use of the Sidetrack. Industry agrees to assume the cost of Railroad's defense and to otherwise indemnify and hold Railroad harmless from Industry's failure to have or to comply with the Governmental Requirement(s).

4. MAINTENANCE

4.1 Railroad and Industry, at their own expense, shall inspect, maintain and renew their respective Segments of the Sidetrack: (A) in accordance with the Federal Railroad Administration Track Safety Standards and (B) in a safe condition, consistent with the operating circumstances and amount of use. Additionally, both Industry and Railroad agree to keep their respective Segments free from debris, weeds, potholes, ice or snow, poles, temporary or permanent structures, other obstructions (Example: parked vehicles), and/or excavations. Railroad shall have the right, but not the duty, to inspect Industry's Segment.

5. CLEARANCES

5.1 Industry agrees to provide and maintain: (A) the lateral clearance requirements (at least eight feet [8'0"] from either side of the centerline of the Sidetrack, as increased for flat curves, superelevated curves and approaches thereto); and (B) the vertical clearance requirements (at least twenty-two feet [22'0"] above the top of the rail), both as detailed in the Specifications, for the entire length of its Segment of the Sidetrack. Lateral and vertical clearances for power poles and lines must also comply with the National Electric Safety Code (NESC).

5.2 Notwithstanding the foregoing, Industry may maintain lesser clearances if: (A) such lesser clearances do not conflict with any Governmental Requirement(s); and (B) plans for such lesser clearances have been provided to Railroad and are not rejected within sixty (60) days after the date of receipt. Industry agrees to install, maintain and replace (at its sole expense) any warning signs or lighting or make other adjustments regarding such lesser clearances as may be required by Railroad or any Governmental Requirement(s).

5.3 Any gate installed by Industry across the Sidetrack must provide an appropriate clearance, as provided in the Specifications, and must be equipped with a double-end bar hasp so that Railroad may install its own lock. If Railroad is unable to open the gate to deliver or retrieve railcars, Industry shall reimburse Railroad for its costs of making an additional trip to the Sidetrack.

6. RIGHT-OF-WAY:

6.1 Industry is responsible for obtaining all necessary right-of-way (through ownership, easement, permit or otherwise), for its Segment of the Sidetrack that is not located on Railroad's right-of-way. The width of such right-of-way must be, at a minimum, sufficient to provide for the Sidetrack and clearances, cuts, fills, drainage ditches, walkways or roads, as determined by Railroad.

CSX-2598

6.2 Industry may use Railroad's right-of-way for a portion of Industry's Segment, if shown on the Plan. Such use, not to exceed six and one-half feet (6 1/2') from either side of the centerline of the Sidetrack, is granted only for the Term of this Agreement. Industry acknowledges that such use is not adverse to Railroad's title, and does not constitute the granting of any right, title, easement or license to Railroad's right-of-way.

6.3 Industry shall not construct or allow the construction of any road (public or private), gate, tunnel, bridge, culvert, pit, gasline, pipe or similar items on, over, under or along the entire Sidetrack or right-of-way without the written permission of Railroad. If Railroad's permission is granted, Industry understands that a separate agreement might be necessary and that Industry shall be responsible for the construction, maintenance, repair and removal costs of the foregoing items and ancillary structures, unless otherwise stated therein.

6.4 Industry shall not block or permit the blockage of the sight view area of any road crossing over the Sidetrack.

6.5 Industry shall, at its sole cost and expense, construct, periodically inspect, and maintain any crossing structures necessary in connection with any road crossings over its Segment, together with reflectorized "Railroad Crossing" signs (including signs for the number of tracks) and reflectorized "Stop" signs on each side of such road crossings with such signs clearly visible to vehicular traffic approaching the road crossing from either direction.

7. RAIL SERVICE:

7.1 Railroad agrees, pursuant to the provisions of this Agreement, its tariffs, circulars, rules and rail transportation contracts, to operate over the Sidetrack in the delivery, placement and removal of railcars consigned to or ordered by Industry, at such times established by Railroad. Railroad may also use Industry's Segment of the Sidetrack for its own general or emergency operating purposes, so long as such purposes do not materially affect the use of the Sidetrack for rail service to Industry.

7.2 Industry shall not permit the use of the Sidetrack by or for the account of third parties without the written consent of Railroad. If such use occurs without such consent, Industry assumes the same responsibilities, as stated in this Agreement for such use as if for its own account. Railroad shall not be required to provide rail service to such third parties.

7.3 Railroad shall be deemed to have delivered any railcar consigned to or ordered by industry when such railcar has been placed on Industry's Segment, so as to allow access by Industry, and Railroad's locomotive has uncoupled from the railcar. At that time, Railroad shall be relieved of all liability as a common or contract carrier or as a bailee, and possession of the railcar and its contents shall be transferred to Industry. Similarly, any obligation of Railroad as a common or contract carrier or as a bailee shall not begin until it has coupled its locomotive to the loaded railcar and departed the Sidetrack.

7.4 Industry is responsible for all railcars and their contents while in Industry's possession and assumes all responsibility for payment of all damage to any railcar and its contents that may occur during that time, even if caused by third parties.

7.5 If Railroad is unable to deliver a railcar on the Sidetrack for loading or unloading due to the acts of Industry or any third party, then such railcar will be considered as constructively placed for demurrage purposes at the time of attempted delivery.

8. HAZARDOUS MATERIALS:

8.1 The following provisions apply when the Sidetrack is used for the delivery of tender of any dangerous, flammable, explosive or hazardous commodity (hereinafter "Hazardous Materials:), as determined by the U.S. Department of Transportation under the Hazardous Materials Transportation Act (49 U.S.C. §§ 1801, et seq.) and the Hazardous Materials Regulations (49 C.F.R. Parts 170-179) issued thereunder, as amended from time to time.

CSX-8598

8.2 No Hazardous Materials shall be placed: (A) on the Sidetrack (except railcar shipments); (B) within the clearance requirements established herein; or (C) within one hundred (100) feet of Railroad's connecting mainline track.

8.3 Industry shall comply with all recommended practices of the Association of American Railroads and all Governmental Requirement(s) regarding the loading, unloading, possession, transfer and/or storage of Hazardous Materials, including but not limited to the installation and use of pollution abatement and control structures and other equipment that is prudent or required under such practices and/or Governmental Requirement(s).

8.4 In the event of a Hazardous Materials leak, spill, or release, Industry shall immediately notify the appropriate Governmental Response Center and Railroad's appropriate Division Manager and, at its sole expense, take all appropriate steps to clean, neutralize and remove the spill.

9. ALTERATIONS:

9.1 Industry shall supply Railroad with construction plans of any addition, deletion or modification to Industry's Segment of the Sidetrack, and obtain Railroad's written consent (which will not be unreasonably withheld) prior to making any such change.

10. SUSPENSION AND TERMINATION:

10.1 Railroad may temporarily suspend its operations over the Sidetrack if, in its sole opinion, the condition of Industry's Segment of the Sidetrack is unsafe or if such operations would interfere with its common carrier duties. Railroad may impose the suspension orally, but shall also provide a written notice to Industry regarding such temporary suspension.

10.2 Either party may terminate this Agreement upon the default of the other party. The party claiming a default must provide the other party with written notice. If the default is not corrected within thirty (30) days of the date of such notice, the party claiming default may terminate this agreement upon written notice. Use of the Sidetrack by Railroad during any notice period shall not be considered as a waiver of any default claimed by it.

10.3 If the roadhaul revenue traffic handled over the Sidetrack is insufficient to meet Railroad's costs in maintaining and replacing its Segment, Railroad will notify Industry and request that Industry agree to pay an annual maintenance fee regarding Railroad's Segment. If Industry does not agree to pay the fee within thirty (30) days from the date of such notice, then Railroad has the right to refuse to provide service to Industry over the Sidetrack, and/or to terminate this Agreement.

10.4 This Agreement will terminate, without the necessity of further notice, upon the abandonment of Railroad's connecting mainline track.

10.5 Either party may terminate this Agreement, beginning five (5) years after the Sidetrack was approved for service by Railroad, by extending thirty (30) days' notice to the other party.

10.6 Upon the termination of this Agreement, each party may remove any portion of its Segment that rests upon the right-of-way of the other party. If not removed within sixty (60) days after such termination, title to that remaining Segment will pass to the other party, who may then remove it and restore the underlying right-of-way at the expense of the prior owner.

11. LIABILITY AND INSURANCE:

11.1 Except as otherwise provided herein, any and all damages, claims, demands, causes of action suits, expenses (including attorney's fees and costs), judgements and interest whatsoever (hereinafter collectively "Losses") in connection with injury to or death of any person or persons whosoever (including employees, invitees and agents of the parties hereto) or loss of or damage to any property whatsoever arising out of or resulting directly or indirectly from the construction, maintenance, repair, use, alteration, operation or removal of the Sidetrack shall be divided between the parties as follows:

CSX-8598

(A) Each party shall indemnify and hold the other party harmless from all Losses arising from the indemnifying party's willful or gross negligence, its sole negligence and/or its joint or concurring negligence with a third party.

(B) The parties agree to jointly defend and bear equally between them all Losses arising from their joint or concurring negligence.

(C) Notwithstanding the foregoing, and irrespective of the sole, joint or concurring negligence of Railroad, Industry acknowledges that it is solely responsible for and agrees to indemnify and save Railroad harmless from all Losses arising from: (i) the failure of Industry to properly maintain its Segment of the Sidetrack; (ii) the construction, alteration or removal of the Sidetrack by Industry; (iii) the presence of a restricted clearance on Industry's Segment; (iv) any personal injuries (including death) or property damage (real or personal) sustained by Industry or Carrier (including their employees) or any third party as the result of any road crossing collision on Industry's Segment; or (v) the explosion, spillage and/or presence of Hazardous Materials on its properties, facility or on Industry's Segment, but only when such Losses would not have occurred but for the dangerous nature of the Hazardous Materials.

11.2 Industry, at its sole cost and expense, must procure and maintain in effect during the continuance of this Agreement, a policy of Commercial General Liability Insurance insuring liability assumed or contracted under this Agreement with a limit of not less than $3,000,000 Combined Single Limit for personal injury and property damage per occurrence. The policy must contain a Contractual Liability Coverage Endorsement. ~~[illegible]~~ Industry must provide Railroad with an appropriate certificate of insurance reflecting the foregoing obligations, at least fifteen (15) days prior to any construction or use of the Sidetrack. Failure of Industry to comply with such demand shall be an event of default as provided in Section 10.2, except that the time period to correct the default is five (5) days.

Initial [signature]

12. ASSIGNMENT:

12.1 This Agreement may not be assigned without the written consent of either party, but shall be assumed by their successors thru merger or acquisition. Industry may sell or assign its Segment of the Sidetrack and right-of-way upon notice to Railroad, but such transactions shall not affect this Agreement or carry any rights regarding any rail service described in this Agreement.

12.2 Notwithstanding the provisions of Sections 12.1 or 10.4, Railroad may assign this Agreement to any new owner or operator of its connecting mainline track.

13. MISCELLANEOUS:

13.1 Each provision of this Agreement is severable from the other provisions. If any such provision is ruled to be void or unenforceable, the remaining provisions will continue in full force and effect.

13.2 Other documents may also describe and cover a portion of the rail service and other provisions of this Agreement. Should any conflict arise between such other documents and this Agreement, Railroad may designate which provision will control.

13.3 The section captions in this Agreement are for the convenience of the parties and are not substantive in nature. All words contained in this Agreement shall be construed in accordance with their customary usage in the railroad industry.

13.4 The failure of either party to enforce any provision of this Agreement or to prosecute any default will not be considered as a waiver of that provision or a bar to prosecution of that default unless so indicated in writing.

13.5 All notices shall be in writing, shall be sent to the address contained in the introductory section and shall be considered as delivered: (A) on the next business day, if sent by telex, telecopy, telegram or overnight carrier; or (B) five (5) days after the postmark, if sent by first class mail.

CSX-8598

14. COMMUNICATIONS CABLE OR FIBER OPTIC LINE PROTECTION

14.1 No construction of any type pursuant or related in any way to this Agreement shall be commenced by Industry, or by any agent, representative, contractor, subcontractor of Industry, without Industry giving at least thirty (30) days written notice to, and receiving written consent from the following parallel cable occupier(s):

("U.S. Sprint") Mr. John Fleeman
Manager of Facility Operations
U.S. Sprint Communications Company
3065 Hargrove Road, Suite 465
Atlanta, GA 30339
Phone No. (404) 859-8770 Collect

("MCI") Mr. Randy K. Dallinger
MCI Telecommunications Corporation
400 International Parkway
Richardson, TX 75081
Dept. 1106/041
Phone No. 1-800-624-9675

14.2 The notice shall be accompanied by drawing(s) showing the general plan, elevation, details and methods of the proposed construction, and the location of occupier(s)' cable in relation to the proposed construction.

14.3 Any changes, alteration, relocation or protection of wire(s), cable(s) of occupier(s), required by said occupier(s), shall be at Industry's expense and as negotiated between Industry and said occupier(s).

14.4 Industry must locate and protect any existing cable, wire or fiber optic line (including any appurtenances thereto) of said cable occupier(s) which may traverse or be located in, on, or immediately adjacent to the Crossing, at Industry's cost.

14.5 Industry shall be solely responsible and liable for any damage (e.g., cutting, dislocating, etc.) to said wire or fiber optic line or cable, and appurtenances thereto, resulting in any way from or incident to Industry's exercise of rights or privileges under this Agreement. Industry shall defend, indemnify and hold Railroad harmless from any such damage claims and any relocation or protection costs.

15. INDUSTRY SWITCHING:

15.1 Industry shall have the right to switch with its own trackmobile or locomotive power over Industry's Segment of the Sidetrack. In no event shall Industry perform any switching service or operate over Railroad's Segment of the Sidetrack. Further, in consideration therefor, Industry assumes all risk of loss, damage, cost, liability, judgment and expense, (including attorneys' fees) in connection with any personal injury to or death of any persons, or loss of or damage to any property, whether employees of either Industry or Railroad or third persons, or property of either Industry or Railroad or of other persons, that may be sustained or incurred in connection with, or arising from or growing out of, the operation of Industry's trackmobile or locomotive power upon said Sidetrack.

16. FORCE MAJEURE:

16.1 In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-out labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or other reasons not the fault of, or under the control of the party delayed in its performance hereunder, then said performance shall be excused for the period of the delay and the period for performance shall be extended for a period equivalent to the period of such delay. The provisions of this Section shall not excuse the prompt payment of amounts required by the terms hereof.

Initial

CSX-8598

Initial

17. 16. ENTIRE UNDERSTANDING:

17.1 16.1 This Agreement constitutes the entire understanding of the parties, is to be construed under the laws of the state in which the Sidetrack is located, may not be modified without the written consent of both parties, and has been executed by their duly authorized officials.

GENERAL MILLS, INC.

By: [signature]

PATRICK J. MCNULTY

Title: ~~PLANT MANAGER~~

CSX TRANSPORTATION, INC.

By: [signature]

Title: DIRECTOR CONTRACTS

CSX Rail Transport

CSX Form 1550AT - Page 1
CSX-008598 - Suppl. 6

## SUPPLEMENTAL SIDETRACK AGREEMENT

THIS SUPPLEMENTAL AGREEMENT, Made as of August 16, 2000, between CSX TRANSPORTATION, INC., a Virginia corporation, hereinafter "Railroad", whose mailing address is 500 Water Street, Jacksonville, Florida 32202, and GENERAL MILLS, a Delaware corporation, whose mailing address is 16200 Avenue of Champions, Covington, GA 30014, hereinafter referred to as the Industry;

WITNESSETH: - that

WHEREAS, on February 9, 1989, a certain agreement was entered into between Railroad and Industry covering maintenance, ownership, use and operation of track facilities, hereinafter called sidetrack at Milepost YYG-127.37, Covington, Newton County, Georgia, to serve facilities of the Industry; said Sidetrack being shown on Plan No. A-0804 dated May 10, 2000, attached to and made a part of said agreement; and

WHEREAS, it is the desire of the parties involved to so amend the agreement dated February 9, 1989, to include two additional tracks located on property of or provided by the Industry.

NOW, THEREFORE, IN CONSIDERATION OF THE PREMISES, AND OF THE MUTUAL COVENANTS HEREINAFTER SET FORTH, THE PARTIES HERETO COVENANT AND AGREE AS FOLLOWS:

The addition of Track No. 5 from Track Station 9+50=0+00 to Track Station 3+91, and the addition of Track No. 4 from Track Station 9+50=0+00 to Track Station 4+87. All other terms and conditions shall apply.

It is distinctly understood and agreed that except as herein provided, this supplemental agreement shall not be construed as cancelling or otherwise making void any of the provisions of said agreement dated February 9, 1989 and the said agreement dated February 9, 1989, shall remain in full force and effect in accordance with its terms.

CSXT Form 1550AT - Page 2
Agreement No. CSX-008598
Suppl.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be duly signed, sealed and delivered in duplicate effective the day and year first above written.

Witness for Railroad:

CSX TRANSPORTATION, INC.

By: ____________________

Print/Type Name: Karen E. Mohler

Print/Type Title: Director-Contract Administration

Witness for Industry:

GENERAL MILLS

By: ____________________

Who, by the execution hereof, affirms that he/she has the authority to do so and to bind the Industry to the terms and conditions of this Agreement.

Print/Type Name: Brad Lenker

Print/Type Title: GMI Covington Distribution Manager

Tax Identification Number: ____________________


NOTES
3. R.R. FORCES TO BUILD TO STA.
4. R.R. TO OWN & MAINTAIN TO STA.
TO ATLANTA
TO AUGUSTA
GENERAL MILLS, INC
OVERALL SITE PLAN
C-102
REV. 11/15/08 W.E.Z.



25'
25'
10+41 EXIST. PS #8 T.O.
TRK. #4
PT
PC
PT
PC
26'
18.5'
9+30 PRO. DERAIL
26' PAVED ROAD
GAS VENT
3+91 END PRO. TRK. #5
4+87.6 END PRO. TRK. #4
Δ = 14°18'20"
D = 12°00'
R = 478.34'
L = 119.21'
T = 60.03'
PC = 1+25.93
PT = 2+45.14
Δ = 07°09'10"
D = 12°00'
R = 478.34'
L = 59.61'
T = 29.9'
PC = 2+00.98
PT = 2+60.59
1+00=0+00 PRO. PS #8 T.O. PRO. TRK. #5
9+50=0+00 PRO. PS #8 T.O. PRO. TRK. #4
R/W
CSX MAIN LINE
TO AUGUSTA
R/W
100'
TO ATLANTA
MP. INC.
NOTE: NO EXCESSIVE CURVATURE
CSX TRANSPORTATION
DESIGN & CONSTRUCTION ENGINEERING DEPARTMENT
REVISIONS
TRACK TO SERVE
GENERAL MILLS INC.
COVINGTON, GA
NEWTON COUNTY
ATLANTA DISTRICT SUBDIV: GEORGIA
SCALE: 1"=100'
DATE: 5/10/00
DRAWN: JPR
CHECKED: DMA
VAL. SEC.
V-2 GA.
32
DRAWING NO.
A-0804
FILE:
LEGEND
PROPOSED TRACK
EXISTING TRACK
6732+61.5 ℄ O.H.B.
SR 142
6733+72.4=0+00 PS #10 T.O.
TRK. #127-1
YYG-127
6714+37
1936'

# EXHIBIT B

**CASEY GILSON LEIBEL P.C.**
ATTORNEYS AT LAW
SIX CONCOURSE PARKWAY, SUITE 2200
ATLANTA, GEORGIA 30328
www.caseygilson.com

SANDRA GRAY
sgray@caseygilson.com

TELEPHONE: (770) 512-0300
FACSIMILE: (770) 512-0070

June 18, 2007

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

General Mills Cereals, LLC
c/o CT Corporation System
1201 Peachtree Street, NE
Atlanta, GA 30361

General Mills, Inc.
ATTN: Director Risk Management
15200 Industrial Park Blvd.
Covington, GA 30014

******* **NOTICE OF LAWSUIT and TENDER OF DEFENSE** *******

Re: *Burchfield v. CSX Transp., Inc. et al.*
N.D.Ga. Atlanta Division
Civil Action No. 1:07 CV 1263 (TWT)
CGL File No. CX1382

Dear Sir/Madam:

This law firm represents CSX Transportation, Inc. in the above-referenced matter. This letter serves to put your company on notice that a lawsuit has been filed by Doug Burchfield, an employee of General Mills at its cereal processing plant in Covington, Georgia. The lawsuit was filed in the District Court for the Northern District of Georgia, Atlanta Division, where it is pending before Judge Thomas Thrash. Mr. Burchfield seeks recovery for personal injury arising out of an accident at the General Mills plant on or about June 5, 2005. Mr. Burchfield suffered amputation of both lower legs during rail car switching operations at the plant. Mr. Burchfield alleges in his lawsuit that the handbrake on the rail car that injured him was defective and/or improperly applied, causing the car to roll down an incline, causing him injury. CSX Transportation, Inc., which provides rail freight service to the Covington plant, is a named defendant in the lawsuit. The Andersons, Inc., the company that on information and belief owns the rail car, is also a named defendant. A copy of the Complaint is enclosed.

CSX Transportation, Inc. ("CSXT") hereby makes demand upon General Mills, Inc. and General Mills Cereals, LLC to provide a defense to CSXT in this action, and hereby formally tenders the defense of this lawsuit to General Mills. CSXT was served with the Complaint on June 6, 2007. Accordingly, under the federal rules its Answer is due on or before Tuesday, June 26, 2007. This firm will protect CSXT's answer date to prevent any default. Please advise within the next ten (10) business days whether you will provide a defense to CSXT in this action. Thank you for your prompt attention to this matter.

Sincerely,
CASEY GILSON P.C.
Sandra Gray
Sandra Gray

Enclosure
cc: Kathy L. Shell
415835-1 Robert E. Casey, Jr., Esq.

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUN 01 2007

JAMES N. HATTEN, CLERK
By: Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **DOUG BURCHFIELD,**<br><br>Plaintiff,<br><br>v.<br><br>**CSX TRANSPORTATION, INC., and THE ANDERSONS, INC.**<br><br>Defendants. | **JURY TRIAL DEMANDED**<br><br>**CIVIL ACTION FILE NO.** 1:07-CV-1263<br><br>TWT |

**COMPLAINT FOR DAMAGES**

COMES NOW Plaintiff in this action, and files his Complaint for Damages against Defendants CSX Transportation, Inc., and The Andersons, Inc., as follows:

**PARTIES**

1.

CSX Transportation, Inc., (hereinafter "CSXT" individually and "Defendants" collectively) is a foreign railroad corporation incorporated in a state other than Georgia with its principal place of business in Florida, is the cause of the incident which is the subject of this action, is liable to Plaintiff, is subject to the jurisdiction of this Court by virtue of diversity of citizenship, and it may be served with Summons and Complaint as allowed by law on its registered agent for service of process, Corporation Service Company, 40 Technology Pkwy South #300, Norcross, Georgia 30092.

2.

The Andersons, Inc., (hereinafter "TAI" individually and "Defendants" collectively) is a foreign corporation incorporated in a state other than Georgia with its principal place of business in Ohio, is the cause of the incident which is the subject of this action, is liable to Plaintiff, is subject to the jurisdiction of this Court by virtue of diversity of citizenship, and it may be served with Summons and Complaint as allowed by law on its registered agent for service of process, National Registered Agents, Inc., 3761 Venture Drive, Duluth, Georgia 30096.

3.

At all times relevant to this action, Defendant CSXT was a common carrier by railroad engaged in the business of operating a railroad in interstate commerce for hire for the purpose of carrying freight in interstate commerce, and TAI was the owner of the hopper car designated as AEX 7136.

4.

Plaintiff Doug Burchfield is a resident and citizen of the State of Georgia.

## JURISDICTION AND VENUE

5.

Jurisdiction is proper in this Court under 28 U.S.C. § 1332 because there is diversity of citizenship of the parties and the amount in controversy is greater than $75,000.

6.

Venue in this division of this Court is proper pursuant to under 28 U.S.C. § 1391 because the incident forming the basis of this action occurred in Newton County, Georgia, which is within the Atlanta Division of the United States District Court for the Northern District of Georgia.

**FACTS**

7.

On or about June 5, 2005, just prior to and at the time of the incident that is the subject of this lawsuit, Plaintiff was performing his duties as an employee of General Mills in Newton County, Georgia.

8.

On or about June 5, 2005, while acting within the scope of his employment with General Mills, which required him to transport/move railcars delivered by CSXT on a spur line at General Mills, Plaintiff was caused to be injured because of the negligence, negligence *per se*, and the wrongful conduct of Defendants and their agents in providing Plaintiff with a railcar (designated AEX 7136) with an unsafe and defective hand brake in violation of reasonable standards of care in the inspection and delivery of railcars to insure that they are safe for use, the Safety Appliance Act known as the Hand Brake Act, 49 U.S.C. §20302(a)(1)(B), and Federal Railway Administration Safety Regulations, 49 C.F.R. § 231.2(a), which govern brakes and railcar safety, in that the railcar on which he was required to work did not have efficient or reasonably safe hand brakes.

9.

On or about June 5, 2005, as a result of Defendants' negligence and negligence *per se*, shown in part by their violation of the Hand Brake Act and applicable Federal Safety Regulations which are part of their common law duties of reasonable care, Plaintiff was caused to suffer serious injuries including the severing of his right leg just below his knee and his left leg just above his knee.

10.

The negligence and wrongful conduct of Defendants is a failure to exercise the standard of care imposed by common law, statute and regulation, and is negligence *per se*, that is, negligence as a matter of law, as well as negligence as a matter of fact.

11.

As a proximate result of the negligence and wrongful conduct of Defendants, Plaintiff was caused to suffer severe and permanent bodily injuries including serious and permanent physical and emotional injury and disability, substantial and continuing pain, and disfigurement, suffering and discomfort, and lost wages, both past and future, and incurred medical expenses, both past and future.

12.

In the future, Plaintiff will suffer additional physical disability, pain, suffering and discomfort, along with additional and significant medical expenses, and further lost wages, all of which are the result of Defendants' negligence and negligence *per se*.

**COUNT ONE**
(Negligence)

13.

Plaintiff repeats, realleges, and incorporates by reference, the allegations of Paragraphs 1 through 12 of this Complaint as if repeated herein as Paragraph 13.

14.

Defendants were negligent and negligent per se in at least the following ways:

A. Defendants put into service on its line a hopper car product (AEX 7136) which had an unsafe and inefficient hand brake, an essential part of a hopper car, in violation of its common law duties as defined in the Hand Brake Act, 49 U.S.C. §20302(a)(1)(B), a Safety Appliance Act of the United States Congress;

B. Defendants put into service on its line a hopper car product (AEX 7136) which had an unsafe and inefficient hand brake, an essential part of a hopper car, in violation of its common law duties as defined in the Federal Safety Regulations at 49 C.F.R. 231.2(a);

C. Defendant CSXT delivered to General Mills a hopper car product (AEX 7136) which had not been properly or reasonably inspected to discover that it had defective brakes and was unsafe; and

D. Defendants failed to warn General Mills that the hopper car product (AEX 7136) did not have adequate or safe brakes and could not be held in place by its own brakes in the absence of wheel chocks or other cars with adequate and operable brakes to hold it in place.

15.

As a proximate result of Defendants' negligence and violation of their common law duties as defined under Georgia common law which includes as standards of reasonable care the Hand Brake Act and applicable Federal Safety Regulations, Defendants are liable to Plaintiff for delivering a defective hopper car product, and Plaintiff is entitled to an award of special damages for past and future medical expenses in an amount to be shown at trial, lost wages and benefits both past and future, in an amount to be shown at trial, and general damages all in an amount to be determined by a jury of Plaintiff's peers in excess of $75,000.00.

**COUNT TWO**
(Punitive Damages)

16.

Plaintiff repeats, realleges, and incorporates by reference, the allegations of Paragraphs 1 through 15 of this Complaint as if repeated herein as Paragraph 16.

17.

Defendants' ownership, use and delivery of a hopper car product (AEX 7136) which had an unsafe and inefficient hand brake, and which had not been adequately or properly inspected because of Defendants' intentional decision to reduce their car inspection forces and not perform adequate inspections at interchanges with other carriers, at the time cars are inbound into yards, at the times cars are outbound from yards, and when cars are dropped off at customer locations exhibits an intentional, callous and wanton choice to place profits over human safety.

18.

As a direct result, in whole or in part, of Defendants' willful, wanton and callous disregard for safety, punitive damages to punish and deter should be imposed against the Defendants and awarded to the Plaintiff, in an amount to be determined by a jury of Plaintiff's peers in excess of $10,000,000.00.

WHEREFORE, Plaintiff prays FOR A TRIAL BY JURY, that summons issue, that judgment be entered in favor of him and against the Defendants, and that the following relief be granted:

(a) Under Count One, that Plaintiff be awarded his special damages in the amount proved at trial, and that he be awarded general damages, all in an amount to be determined by a jury of Plaintiff's peers;

(b) Under Count Two, that punitive damages be levied against the Defendants and awarded to the Plaintiff in an amount to be determined by a jury of Plaintiff's peers.

(c) That the cost of this action be cast upon Defendants; and,

(d) That Plaintiff be awarded such other and further relief as the Court deems just and proper.

Respectfully Submitted,
WARSHAUER, POE & THORNTON, P.C.

By:____________________
Michael J. Warshauer
Georgia Bar Number 018720
Douglas C. Dumont
Georgia Bar Number 232680

3350 Riverwood Parkway
Suite 2000
Atlanta, Georgia 30339
(404) 892-4900
(404) 892-1020 fax

# EXHIBIT C

GENERAL MILLS

**Ani Gulati**
Assistant General Counsel
Telephone: 763-764-7238
Facsimile: 763-764-5011
Ani.gulati@genmills.com

**Via Fax: (770) 512-0070**

June 29, 2007

Sandra Gray
Casey Gilson Leibel P.C.
Six Concourse Parkway, Ste. 2200
Atlanta, GA 30328

RE: ***Burchfield v. CSX Transp., Inc. et al.***
N.D. Ga. Atlanta Div.
Civil Action No. 1:07 CV 1263 (TWT)
CGL File No. CX1382

Dear Ms. Gray:

This responds to your tender of defense in the above matter. The allegations in the complaint are made against CSX Transportation Inc., not General Mills. Further you have provided no basis for General Mills to consider your request for tender of defense. Therefore, General Mills does not accept your tender in this matter.

Yours truly,

Ani Gulati

# EXHIBIT D

CASEY GILSON P.C.

JAMES E. GILSON
JGILSON@CASEYGILSON.COM

ATTORNEYS AT LAW
SIX CONCOURSE PARKWAY, SUITE 2200 ATLANTA, GA 30328
www.caseygilson.com

TELEPHONE: (770) 512-0300
FACSIMILE: (770) 512-0070

June 26, 2012

General Mills, Inc.
c/o CT Corporation System
1201 Peachtree Street, NE
Atlanta, GA 30361

General Mills, Inc.
Attn: Director, Risk Management
15200 Industrial Park Boulevard
Covington, GA 30014

Re: *Burchfield v. CSX Transportation, Inc.*
U.S.D.C. N.D.Ga. Atlanta Div.
Civil Action File No. 1:07-CV-1263 (TWT)
CG File No. CX1382

To Whom It May Concern:

As you know, this law firm represents CSX Transportation, Inc. ("CSXT") in the above referenced lawsuit. On April 19, 2012 following a jury trial, judgment was entered against CSXT in the amount of $20,559,004 (copy attached). This letter is notice to General Mills, Inc. ("General Mills") that CSXT seeks indemnification from General Mills for the full amount of the verdict and all sums CSXT has or will pay out in attorneys' fees and costs pursuant to the Private Side Track Agreement effective February 9, 1989, as supplemented and reaffirmed on August 16, 2000 ("the Agreement").

Paragraph 15 of the Agreement captioned INDUSTRY SWITCHING places **all** risk of loss on General Mills in connection with **any** personal injury incurred in connection with or arising out of General Mills' operation of its trackmobile. Specifically, Paragraph 15 states:

> Industry shall have the right to switch with its own trackmobile or locomotive power over Industry's Segment of the Sidetrack. In no event shall Industry perform any switching service or operate over Railroad's Segment of the Sidetrack. **Further, in consideration therefor, Industry assumes <u>all</u> risk of loss, damage, cost, liability, judgment and expense, (including attorneys' fees) in connection with <u>any</u> personal injury to or death of any persons, or loss of or damage to any property, whether employees of either Industry or Railroad or third persons, or property of either Industry or Railroad or of other persons, that may be sustained or incurred in connection with, or arising from or**

> **growing out of, the operation of Industry's trackmobile or locomotive power upon said Sidetrack.** (emphasis supplied).

Accordingly, because Mr. Burchfield's injury was sustained "in connection with, or arising from or growing out of, the operation of [General Mills'] trackmobile," General Mills is obligated to indemnify CSXT for all Losses, as defined in the Agreement.

General Mills also is obligated to indemnify CSXT pursuant to Paragraph 11 of the Agreement (LIABILITY AND INSURANCE), which provides that General Mills must indemnify CSXT from all Losses arising from General Mills' "willful or gross negligence, its sole negligence, and/or its joint or concurring negligence with a third party" and from an equal share of Losses arising from joint or concurring negligence with CSXT. CSXT has sustained Losses arising from General Mills' negligence.

CSXT tendered the defense of this lawsuit to General Mills on June 18, 2007. By letter dated June 29, 2007, General Mills declined CSXT's tender of defense. **Demand hereby is made upon General Mills to immediately pay the Judgment in full.** Doing so will avoid the payment of post-judgment interest and additional litigation costs as CSXT has filed post-trial motions and plans to appeal.

CSXT again tenders the defense of this action to General Mills. It is General Mills' responsibility to pay the Judgment and to make CSXT whole for all expenses CSXT has incurred in this case.

Sincerely,

**CASEY GILSON P.C.**

James E. Gilson

JEG:mbb
Enclosure

cc: Tony B. Jolly
Manager of Dry Transportation Operations-Retail
General Mills
Number One General Mills Boulevard
W03B
Minneapolis, MN 55426

665889-1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DOUG BURCHFIELD<br>Plaintiff(s)<br>v.<br><br>CSX TRANSPORTATION, INC.<br>Defendant(s) | CIVIL ACTION NO.<br>1:07cv1263-TWT |

JUDGMENT

This action came before the court for a trial by jury. The issues have been tried and the jury has rendered its verdict in favor of the Plaintiff Doug Burchfield and against the Defendant CSX Transportation, Inc..

Judgement hereby entered in the amount of $20,559,004.00 in favor of the Plaintiff Doug Burchfield and against the Defendant CSX Transportation, plus costs and interest at the legal rate from the date of this judgment to the date payment made in full.

April 19, 2012

JAMES N. HATTEN, Clerk

By /s/Sheila T. Sewell
Deputy Clerk

# EXHIBIT E

BLACKWELL BURKE P.A.

## FAX TRANSMISSION

May 20, 2013

| | | | |
|---|---|---|---|
| To: | James E. Gilson | From: | Mary S. Young |
| Company: | Casey Gilson P.C. | Our Ref.: | 51600-0139 |
| Your Ref: | Burchfield v CSX Transportation, Inc. | Fax No.:<br>Phone No.: | 612-343-3205<br>612-343-3214 |
| **Fax No.:**<br>Phone No.: | **(770) 512-0070**<br>(770) 512-0300 | **Total Pages:** | 2 |
| | | Return Fax To | Mary Dargiewicz |
| Confirmation via Mail: YES ☒ NO ☐ | | | |

**DOCUMENT TRANSMITTED:** Letter to James E. Gilson

**MESSAGE:**

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent for delivering the message to the intended recipient, you are hereby notified that dissemination, distribution or copying of this communication is strictly prohibited. If you received this communication in error, please notify us immediately by collect telephone and return the original message to us at the above address via U.S. Postal Service. Thank you.

BLACKWELL
BURKE P.A.

Mary S. Young
Direct Dial: 612-343-3214
E-Mail: myoung@blackwellburke.com

May 20, 2013

**VIA FACSIMILE AND U.S. MAIL**

James E. Gilson
Casey Gilson, P.C.
Six Concourse Parkway
Suite 2200
Atlanta, GA 30328

Re: Burchfield v. CSX Transportation, et al.
United States District Court (N.D. Ga) Case No. 07-1263
Our File No. 51600-0139

Dear Mr. Gilson:

We are in receipt of your letter of June 26, 2012 seeking indemnity from General Mills for a judgment in excess of $20,000,000 entered against your client, CSXT, on April 19, 2012 in the matter of Doug Burchfield v. CSX Transportation, Inc., et al. (the "Action"), plus related costs and attorneys' fees, based on the Private Sidetrack Agreement effective February 9, 1989.

General Mills rejects CSXT's demand that "General Mills immediately pay the Judgment in full." We understand that on April 17, 2013, Judge Thrash issued his final ruling resolving CSXT's post-trial motions. We further understand that CSXT subsequently filed a notice of appeal to the Eleventh Circuit, *inter alia*, appealing the judgment (as amended and corrected), and that Plaintiff has also filed a notice of appeal of the Court's order on Plaintiff's Motion to Amend Judgment. As such, the Action is not fully resolved and CSXT's request is premature. Accordingly, General Mills rejects CSXT's request for indemnification. Further, in the event CSXT attempts to seek indemnification from General Mills in the future, General Mills expressly reserves its right to assert any and all arguments and defenses to any such claim.

With kindest regards,

Mary S. Young

Mary S. Young
MSY:md

# EXHIBIT F

GUNSTER
FLORIDA'S LAW FIRM FOR BUSINESS

Our File Number: 00031054.00007
Writer's Direct Line" (904) 350-7170
Writer's E-Mail Address: dwells@gunster.com

May 30, 2013

***VIA FEDERAL EXPRESS***

Mary S. Young, Esq.
Blackwell Burke P.A.
431 South Seventh Street, Suite 2500
Minneapolis, MN 55402

**Re: Burchfield v. CSX Transportation, et al.**
**United States District Court (N.D. Ga) Case No. 07-1263**

Dear Ms. Young:

We are in receipt of your letter dated May 20, 2013, rejecting the demand for indemnification that CSX Transportation, Inc. ("CSX") made on June 26, 2012 to your client General Mills, Inc. ("General Mills") in regard to the judgment rendered against CSX in the above referenced matter. As you know, CSX's demand for indemnification is based on the Private Sidetrack Agreement between General Mills, Inc. ("General Mills") and CSX dated February 9, 1989. Notwithstanding your current position concerning the obligation of General Mills to indemnify CSX, we are confident that General Mills is ultimately liable for any judgment and/or settlement paid by CSX, in connection with the above referenced matter as well as any costs, fees, and expenses related to the matter.

Effective immediately, together with Mr. Randall A. Jordan, of The Jordan Law Firm, 1804 Frederica Road, St. Simons Island, Georgia, 31522, we will be handling all aspects of the indemnification claim against General Mills. Please ensure that all future communications are directed accordingly.

Additionally, as part of the Eleventh Circuit appellate process, CSX is required to participate in a court-ordered mediation with Mr. Burchfield. Currently, it appears that June 27 is a date that works for CSX and Mr. Burchfield. We believe, as indemnitor of CSX, that General Mills should attend the mediation. Please advise at your earliest convenience whether you and/or any other representative of General Mills will attend the mediation and if June 27 is an acceptable date.

Additionally, CSX has engaged in preliminary settlement negotiations with Mr. Burchfield in advance of this mediation. With CSX having made several demands for General

Mills to provide indemnification and a defense to CSX, CSX has the right to settle its dispute with Mr. Burchfield without any prejudice to CSX's rights to indemnification from General Mills. In the event that you and General Mills disagree with CSX on this point, please notify us of your position and the support therefor as soon as possible. In addition, please let us know whether General Mills seeks to participate in these settlement discussions.

Finally, CSX previously requested information regarding any insurance policy that may provide coverage to General Mills in this matter. In accordance with O.C.G.A. § 33-3-28(a)(2), within thirty days of the date of this request, please provide us the names of each known insurer which may provide coverage to General Mills in this matter including but not limited to any insurer that may be liable for CSXT's claims for indemnity.

Sincerely,

David M. Wells

DMW/df

cc: Randall A. Jordan, Esq.

JAX_ACTIVE 3316237.1

# EXHIBIT G

GUNSTER
FLORIDA'S LAW FIRM FOR BUSINESS

Our File Number: 00031054.00007
Writer's Direct Telephone Number: (904) 350-7170
Writer's E-Mail Address: dwells@gunster.com

August 28, 2013

***VIA FEDERAL EXPRESS***

Mary S. Young, Esq.
Blackwell Burke P.A.
431 South Seventh Street, Suite 2500
Minneapolis, MN 55402

Re: Burchfield v. CSX Transportation, et al.
United States District Court (N.D. Ga) Case No. 07-1263

Dear Ms. Young:

As you are aware, on June 27, 2013, CSX Transportation, Inc. ("CSX") participated in a court-ordered mediation with Mr. Burchfield in an effort to resolve his claims against CSX in the above-referenced matter. By letter dated May 30, 2013, our firm, on behalf of CSX, invited General Mills, Inc. ("General Mills"), as indemnitor of CSX, to participate in those settlement discussions; however, General Mills declined.

On behalf of CSX, we hereby request indemnification for damages paid by CSX related to the injuries sustained by Mr. Burchfield on June 5, 2005, while operating a trackmobile at General Mills' facility and on General Mills' segment of the sidetrack. This claim arises under the enclosed Private Sidetrack Agreement dated February 9, 1989 (the "Sidetrack Agreement"), which provides, *inter alia*, in Section 15 entitled Industry Switching, as follows:

> Industry shall have the right to switch with its own Trackmobile or locomotive power over Industry's Segment of the Sidetrack. In no event shall Industry perform any switching service or operate over Railroad's Segment of the Sidetrack. Further, in consideration therefor, Industry assumes all risk of loss, damage, cost, liability, judgment and expense, (including attorneys' fees) in connection with any personal injury to or death of any persons, or loss of or damage to any property, whether employees of either Industry or Railroad or third persons, or property of either Industry or Railroad or of other persons, that may be sustained or incurred in connection with, or arising from or growing out of, the operation of Industry's Trackmobile or locomotive power upon said Sidetrack.

Sidetrack Agreement, § 15.1. Indemnification is also available under additional provisions of the Sidetrack Agreement including, but not limited to, Sections 3 and Sections 11.

At mediation, Mr. Burchfield and CSX reached a settlement of Mr. Burchfield's claims in the amount of sixteen million dollars ($16,000,000.00), which CSX has paid to Mr. Burchfield. As a result, CSX now has a final accounting of the amount General Mills is contractually required to indemnify CSX, relating to the defense and settlement of this lawsuit. In addition, to date, CSX has incurred in excess of one million dollars ($1,000,000) in legal fees and expenses. Failure to pay this amount would result in the addition of legal interest until the date of recovery under O.C.G.A. § 13-6-13.

Previously, in response to CSX's demand for indemnification, you stated, by letter dated May 20, 2013, that since the matter was on appeal and the action was not "fully resolved," that CSX's demand was "premature." Now, as the matter is fully resolved, there is no good faith basis for General Mills to deny CSX its contractual right to indemnification. Accordingly, please respond within thirty days, so that CSX can finalize the accounting of the total attorneys' fees and costs incurred, and provide you with that amount along with payment instructions.

If General Mills disagrees with or disputes CSX's contractual right to indemnification, we respectfully request that you provide us with the legal basis for any refusal to pay CSX under the terms of the Sidetrack Agreement.

Sincerely,

David M. Wells

DMW/aj

JAX_ACTIVE 3336087.4

# EXHIBIT H

BLACKWELL
BURKE P.A.

Mary S. Young
Direct Dial: 612-343-3214
E-Mail: myoung@blackwellburke.com

September 26, 2013

***VIA FEDERAL EXPRESS***

David M. Wells, Esq.
Gunster
225 Water Street, Suite 1750
Jacksonville, FL 32202

Re: Burchfield v. CSX Transportation, et al.
United States District Court (N.D. Ga) Case No. 07-1263
Our File No. 51600-0139

Dear Mr. Wells:

We write in response to your August 28, 2013 letter, sent on behalf of CSX, requesting indemnification for damages CSX has incurred in the above-captioned matter, which arose out of Doug Burchfield's June 5, 2005, accident at General Mills' facility in Covington, Georgia. Specifically, CSX requests that General Mills reimburse it for the $16 million it paid to settle the Burchfield claims, along with over $1 million in attorneys' fees and costs.

There is no basis—contractual or otherwise—for the demand that General Mills indemnify CSX for its own negligence and resulting damages; therefore, General Mills denies the request. As requested, what follows is an overview of our legal basis for rejecting CSX's request.

## I. Section 11 of the Parties' Sidetrack Agreement Renders CSX's Indemnity Claim Invalid Because CSX was Solely Negligent.

On June 5, 2005, Doug Burchfield, an employee at General Mills' cereal production plant in Covington, Georgia, was seriously injured when he was struck by a runaway rail car on General Mills' sidetrack, which had been delivered by CSX. The accident resulted in the amputation of both of Mr. Burchfield's legs. On April 19, 2012, the jury returned a verdict in favor of Mr. Burchfield and awarded $20,559,004 in compensatory damages. ***The jury based its award on a finding that CSX was 100% negligent.*** Both CSX and Burchfield filed notices of appeal in the Eleventh Circuit. The case was settled on June 27, 2013, and the lawsuit and related appeals dismissed.

Section 11, the primary section of the Sidetrack Agreement addressing indemnity and insurance obligations states, in relevant part:

> 11.1 Except as otherwise provided herein, any and all damages, claims, demands, causes of action suits, expenses (including attorney's fees and costs), judgments and interests whatsoever (hereinafter collectively "Losses") in connection with injury to or death of any person or persons whomsoever (including employees, invitees and agents of the parties hereto) or loss of or damage to any property whatsoever arising out of or resulting directly or indirectly from the construction, maintenance, repair, use, alteration, operation or removal of the Sidetrack shall be divided by the parties as follows:
>
> (A) ***Each party shall indemnify and hold the other party harmless from all Losses arising from the indemnifying party's*** willful or gross negligence, its ***sole negligence*** and/or its joint or concurring negligence with a third party.
>
> (B) The parties agree to jointly defend and bear equally between them all Losses arising from their joint or concurring negligence.
>
> (C) Notwithstanding the foregoing, and irrespective of the sole, joint or concurring negligence of Railroad, Industry acknowledges that it is solely responsible for and agrees to indemnify and save Railroad harmless from all Losses arising from: (i) the failure of Industry to properly maintain its Segment of the Sidetrack; (ii) the construction, alternation or removal of the Sidetrack by Industry; (iii) the presence of a restricted clearance on Industry's Segment; (iv) any personal injuries (including death) or property damages (real or personal) sustained by Industry or Carrier (including their employees) or any third party as the result of any road crossing collision on Industry's Segment; or (v) the explosion, spillage and/or presence of Hazardous Materials on its properties, facility or on Industry's Segment, but only when such Losses would not have occurred but for the dangerous nature of the Hazardous Materials.

Sidetrack Agreement at Section 11.1 (emphasis added).

Under its plain terms, Section 11.1(A) of the Sidetrack Agreement does not provide a basis for an indemnity claim by CSX against General Mills for the April 19, 2012 judgment because it requires the indemnitor (here, General Mills) to protect the indemnitee (CSX) only if the indemnitor (General Mills) is negligent. The jury concluded that CSX was 100% negligent—meaning 100% individually at fault as compared to anyone else in the world who could have been potentially at fault for Mr. Burchfield's injuries. The plain terms of Section 11.1(A) thus preclude CSX's request for indemnification.

For the same reason, Section 11.1(B) does not provide a basis for contractual indemnity—there was no "joint or concurring" negligence; rather, CSX was 100% at fault. And, Section 11.1(C) is in applicable because the losses for which CSX seeks indemnification did not arise out of any of the factual bases identified in Section 11.1(C)(i)-(v), but rather arose out of CSX's sole negligence.

**II. CSX's Request for Indemnity Under Section 15 Fails.**

CSX's attempt to rely on Section 15 of the Sidetrack Agreement as a basis for indemnity also fails. Section 15.1 provides:

> Industry shall have the right to switch with its own trackmobile or locomotive power over Industry's Segment of the Sidetrack. In no event shall Industry perform any switching service or operate over Railroad's Segment of the Sidetrack. Further, in consideration therefore, ***Industry [General Mills] assumes all risk of loss, damage, cost, liability, judgment and expense, (including attorneys' fees) in connection with any personal injury to*** or death of ***any persons***, or loss of or damage to any property, whether employees of either Industry or Railroad or third persons, or property of either Industry or Railroad or other persons, ***that may be sustained or incurred in connection with, or arising from or growing out of, the operation of Industry's trackmobile or locomotive power upon said sidetrack.***

Sidetrack Agreement, Section 15.1 (italics and bolding added).

**A. The Losses Are Outside the Scope of Section 15.**

Section 15 only covers losses "sustained or incurred in connection with, or arising from or growing out of, the operation of [General Mills'] trackmobile or locomotive power upon said sidetrack." The jury concluded that CSX was 100% at fault for Mr. Burchfield's injuries. It necessarily follows that the accident was solely caused by the faulty hand brake on the runaway rail car delivered by CSX. Accordingly, the losses for which CSX seeks indemnity were not "sustained or incurred in connection with, nor did they arise from or grow out of," the operation of the trackmobile by General Mills; rather, they were solely caused by CSX's own negligence in delivering a defective rail car.

**B. Section 15 Does Not Provide For Indemnification Because The Provision is Not an "Expressly Stated" Agreement to Indemnify CSX for CSX'S Negligence.**

Further, Section 15 does not include express indemnification-for-indemnitee's-negligence language as required by Georgia law. Georgia courts have repeatedly held that contractual indemnity provisions "do not extend to losses caused by an indemnitee's own negligence unless the contract expressly states" – in "express language" – that the negligence of the indemnitee is covered." *Ryder Integrated Logistics Inc. v. BellSouth Telecomm., Inc.*, 642 S.E.2d 695, 697 (Ga. 2007) ("Georgia courts ***never*** imply an agreement to indemnify another for one's own negligence in the absence of express language." (emphasis added) (citation and quotation omitted)); *see also Serv. Merch. Co. v. Hunter Fan Co.*, 617 S.E.2d 235, 240 (Ga. Ct. App. 2005) ("Unless the words of a contract explicitly show an agreement to indemnify another party for his own negligence, such an agreement cannot be implied."). Because the Agreement does not contain express language entitling CSX to indemnification for its sole negligence, and in light of the jury's finding that CSX was 100% at fault, Georgia law is clear that CSX is not entitled to any form of indemnity. *See United Parcel Serv. v. Colt Sec. Agency, Inc.*, 676 S.E.2d 22, 25 (Ga. Ct. App. 2009) (indemnity clause unenforceable in light of indemnitee's sole negligence).

Moreover, in addition to this broad prohibition against interpreting indemnity agreements to cover an indemnitee's negligence, Georgia's rules of contract interpretation make clear that Section 15 does not provide a contractual right to indemnification. These rules include: (1) "the words of a contract of indemnification must be construed strictly against the indemnitee" (here CSX); (2) "[w]hen an indemnity agreement is ambiguous, such ambiguity must be construed against the drafter" (again, CSX). *Hunter Fan Co.*, 617 S.E.2d at 237-38. Because Section 15 does not expressly include indemnification-for-indemnitee's-negligence language, the courts *must* construe the contract against CSX (both as the drafter and indemnittee), and *Section 15 cannot be construed more broadly than it is written. See So. Ry. Co. v. Union Camp Corp.*, 353 S.E.2d 519, 520-21 (Ga. Ct. App. 1987); *Park Pride Atlanta, Inc. v. City of Atlanta*, 541 S.E.2d 687, 690-91 (Ga. Ct. App. 2000).

Finally, even if the court wholly disregarded longstanding and universally accepted rules of contract construction by reading indemnity-for-indemnitee's-negligence into Section 15 (which it would not), public policy would render the provision void and unenforceable. *See*, *e.g.*, Ga. Code Ann. § 13-8-2(b) (2011) (stating that provisions in contracts "relative to the construction, alteration, repair, or maintenance" of various structures that provide for indemnification for indemnitee's sole negligence is void and unenforceable as against public policy).

**III. CSX's Attempt to Invoke Section 3 of the Sidetrack Agreement Also Fails.**

Finally, CSX suggests that indemnification is available under Section 3 of the Sidetrack Agreement. Section 3 of the Sidetrack Agreement provides:

> Industry agrees, at its sole expense, to comply with all governmental regulations and to obtain all necessary governmental permits, authorizations, order and approvals hereinafter collectively "Governmental Requirement(s)") necessary for the construction, maintenance and use of the Sidetrack. Industry agrees to assume the cost of Railroad's defense and to otherwise indemnify and hold Railroad harmless from Industry's failure to have or to comply with the Governmental Requirement(s).

There is no factual basis for CSX's apparent position that General Mills failed to comply with Governmental Regulations. It follows that there is no connection whatsoever between an alleged failure on the part of General Mills to comply with Governmental Regulations and the damages CSX has incurred as a result of its sole negligence, which caused the Burchfield accident. Section 3 has no bearing on CSX's request.

In conclusion, there is absolutely no contractual basis for indemnification, and General Mills rejects CSX's request. General Mills greatly values its business with the railroad, and wishes to keep an open dialogue about this matter. If you disagree with the analysis set out here, we request that you provide the same courtesy that we have provided, by setting out your legal basis within thirty days of receipt of this letter.

With kindest regards,

Mary S. Young

Mary S. Young

MSY:md

cc: Jerry W. Blackwell