**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC., | : | |
| | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | Civil Action |
| | : | File No.: 1:14-cv-00201-TWT |
| GENERAL MILLS, INC., | : | |
| | : | |
|     Defendant. | : | |

**AMENDED COMPLAINT**

CSX Transportation, Inc. ("CSXT"), Plaintiff in the above-styled civil action, files this amended complaint against Defendant General Mills, Inc. ("General Mills") showing the Court as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.    CSXT is a corporation incorporated under the laws of the State of Virginia and having its principal place of business in the State of Florida.

2.    General Mills is a corporation incorporated under the laws of the State of Delaware and having its principal place of business in the State of Minnesota. General Mills transacts business within the State of Georgia and owns, uses, and possesses real property within the State of Georgia.  General Mills has purposely directed activities at residents of the State of Georgia, and this litigation arises out

of those activities.  General Mills has continuous and systematic general business contacts within the State of Georgia.  Therefore, General Mills is subject to the jurisdiction of this Court.  *See* O.C.G.A. § 9-10-91; U.S. Const. amend. XIV.

3.     The matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.00, and there is complete diversity of citizenship between CSXT and General Mills, and, therefore, this action is within this Court's jurisdiction pursuant to 28 U.S.C. § 1332.

4.     Pursuant to 28 U.S.C. §1391, venue is proper in this Court because the incident forming the basis of this action occurred in Newton County, Georgia, which is within the Atlanta Division of the United States District Court for the Northern District of Georgia.

## BACKGROUND AND FACTUAL INFORMATION

5.     CSXT is a Class 1 freight railroad providing rail transportation services in and around Covington, Georgia and serving General Mills using a sidetrack, which extends onto the property of General Mills.

6.     General Mills maintains a cereal processing plant in Covington, Georgia, which receives rail service from CSXT.

7.     On and effective February 9, 1989, CSXT and General Mills entered into a Private Sidetrack Agreement (hereinafter referred to as the "Sidetrack

Agreement").  A true and correct copy of the Sidetrack Agreement is attached hereto and incorporated herein as **Exhibit A**.

8.     At the time the parties entered into the Sidetrack Agreement (and subsequently), General Mills was a larger company than CSXT and suffered from no disparity in bargaining power.

9.     As explained in Section 1, the purpose of the Sidetrack Agreement is to detail the provisions of the construction, maintenance, and use of a private sidetrack for the tender and receipt of rail freight traffic for General Mills.  A sidetrack is a railroad track that is connected to the main track, and used by the railroads and its customers for delivering, picking up, or storing railcars that contain a customer's freight or that have been unloaded.

10.     Section 11.1 of the Sidetrack Agreement generally sets forth the parties' respective indemnification rights and obligations and expressly recognizes that its applicability is limited as otherwise provided for in the Sidetrack Agreement.

11.     Section 15 of the Sidetrack Agreement grants General Mills the right to conduct "switching" on its portion of the private sidetrack.  "Switching" refers to the process of moving railcars that have been previously delivered by a train or assembling railcars in the proper order so that they can be coupled to a locomotive

and pulled out of a customer's facility.  Generally, switching involves moving railcars short distances, often between divergent rail tracks.

12.    Normally, the switching of railcars would be conducted by CSXT, using its own locomotive power  and its highly skilled railroad work force.

13.    Here, however, General Mills wanted the ability at some point to conduct its own switching operations over its section of the private sidetrack. Accordingly, the parties negotiated Section 15 of the Sidetrack Agreement, which provides:

> Industry shall have the right to switch with its own Trackmobile or locomotive power over Industry's Segment of the Sidetrack.  In no event shall Industry perform any switching service or operate over Railroad's Segment of the Sidetrack.

Exhibit A at § 15.1.

14.    Because allowing General Mills to conduct its own switching operations would mean that CSXT would lose both (i) the revenues it would otherwise receive from performing those operations itself and (ii) control over the risks entailed in conducting such operations, General Mills provided separate consideration for the right to perform its own switching operations.  Specifically, the parties included in Section 15 the following indemnity provision:

> Further, in consideration [for General Mills's right to perform its own switching operations], Industry assumes <u>all</u> risk of loss, damage, cost, liability, judgment and expense, (including attorneys' fees) in

> connection with <u>any</u> personal injury to or death of any persons, or loss of or damage to any property, whether employees of either Industry or Railroad or third persons, or property of either Industry or Railroad or of other persons, that may be sustained or incurred in connection with, or arising from or growing out of, the operation of Industry's Trackmobile or locomotive power upon said Sidetrack.

Exhibit A at § 15.1 (emphasis in original).

15.    The parties agreed on language that on its face provided that, if General Mills were to acquire a trackmobile and begin conducting its own switching operations, it would be obligated to indemnify CSXT for any and all losses arising out of use of the trackmobile, including losses caused solely by the negligence of CSXT.

16.    From the time the side track became operational in 1989 until mid to late 2000, CSXT performed switching operations for General Mills.  During that time General Mills paid CSXT for performing the switching operations.  And because CSXT's employees were well trained, no accidents resulting in injuries occurred as a result of switching operations at the Covington facility during this 10+ year period.

17.    In or around early 2000, General Mills determined that it wanted to perform its own switching operations.  In order to do so, General Mills purchased a trackmobile to move railcars within the General Mills facility utilizing General Mills employees.  A trackmobile is a mobile railcar mover, capable of traveling on

both roads and railroad tracks, fitted with couplers for moving small numbers of railcars.

18.    The General Mills trackmobile was capable of riding on the railroad tracks, coupling to railcars, physically pushing or pulling the railcars to different locations, and then being uncoupled from the railcars once the railcars had been moved and secured in place by the General Mills employees.

19.    On or about June 2000, General Mills trackmobile was purchased from Barloworld and delivered to General Mills.    In addition to the sale, Barloworld entered into an agreement with General Mills to provide General Mills employees with precise training on the safe and proper operation of a trackmobile in the General Mills facility, which required both classroom instruction and hands-on demonstration.

20.    The Barloworld training and the trackmobile manual required, among other things, that chocks be utilized at all times on any railcars not coupled to the trackmobile or other locomotive power, and particularly when cars would be left unattended, unconnected, or uncoupled on a grade or incline.

21.    During the Barloworld training and certification required to operate the trackmobile, General Mills, through certain of its selected employees, was instructed to chock the descending-end wheels of railcars parked on an incline and

on unattended railcars to prevent them from rolling.  General Mills employees, including employee Doug Burchfield, were also instructed that individuals who were not properly trained, both with in-classroom instruction and hands-on demonstration, were not to operate the trackmobile.

22.     Years after General Mills purchased a trackmobile to conduct its own switching operations, on June 5, 2005, General Mills employee Doug Burchfield sustained significant personal injury, including partial amputation of both legs, while in the course of using the General Mills trackmobile to conduct industry switching on General Mills's segment of the sidetrack at the General Mills facility in Covington, Georgia.

23.     At the time of the incident, Mr. Burchfield and fellow General Mills employee, Rodney Turk, were switching various railcars on the General Mills segment of the private sidetrack, including a 286,000 pound loaded railcar (hereinafter referred to as "AEX 7136").

24.     At the time of the incident, the private sidetrack consisted of four separate tracks that split from the main track after it entered General Mills's property.  Three of the tracks were used by General Mills to hold railcars, while the other track traveled into a covered building where General Mills employees unloaded cars for General Mills's cereal-making operations.

25.    On the date of the incident, Mr. Burchfield and Mr. Turk used the trackmobile to move AEX 7136 around the Sidetrack and from one track to an adjacent holding track.  Throughout these movements, Mr. Turk operated the trackmobile.  Mr. Turk had received little, if any, training regarding the use of the trackmobile and switching operations and was not qualified by any measure to operate the trackmobile.

26.    After Mr. Turk placed AEX 7136 on the holding track, uncoupled it from the trackmobile, and drove the trackmobile away from AEX 7136, he observed movement by AEX 7136.  After AEX 7136 was observed to move, neither Mr. Burchfield nor Mr. Turk, in performing their duties as General Mills's employees, rechecked the handbrake, chocked the wheels, performed a "push-pull" test, or took any other action to verify that it was secured safely in place.

27.    Mr. Burchfield and Mr. Turk traveled in the trackmobile to an adjoining track for further switching operations, passing over an unapplied manual derail device. Neither Mr. Burchfield nor Mr. Turk engaged the manual derail device.  Had they done so, it would have stopped AEX 7136 when the car started rolling down the track upon which it had been placed, which ultimately happened.

28.    While in the trackmobile, Mr. Burchfield and Mr. Turk proceeded to move an empty railcar on a portion of the sidetrack downhill from and directly

below the location of AEX 7136. Mr. Turk continued to operate the trackmobile throughout these movements. It was then, while Mr. Burchfield was out of the trackmobile, that AEX 7136 rolled down the track and crashed into both the trackmobile and attached empty railcar. The empty railcar, AEX 7136, and the trackmobile were pushed through a "split-rail" derailer device, causing the empty railcar and the trackmobile to completely derail and AEX 7136 to partially derail, as its front-end wheels also traveled through the "split-rail" derailer device.

29.    As a result of the collision, the empty railcar, the trackmobile, and AEX 7136 ran over Mr. Burchfield, and he sustained significant personal injuries. The injuries to Mr. Burchfield were sustained in connection with, arising from, or occurring out of, the operation of General Mills's trackmobile upon General Mills's segment of the private sidetrack located at the General Mills facility.

30.    In its post-accident investigation, General Mills determined that (i) the loaded railcar AEX 7136's handbrake was not in the set, or applied, position after the incident; (ii) no one, including his co-worker Mr. Turk, had observed Mr. Burchfield set the handbrake on AEX 7136 when it was uncoupled from the trackmobile; (iii) no chocks had been applied on AEX 7136 even though it was unattended, unconnected, and uncoupled alone on a grade; and (iv) the manual derail device had not been applied by Mr. Burchfield or Mr. Turk.

31.    In its post-accident investigation, General Mills retained Rail Sciences, Inc. and its President, Gary Wolf.  Mr. Wolf performed various tests for General Mills on the loaded railcar including tests of the brake shoes, handbrake mechanism, and ability of AEX 7136 to be held in place by application of the railcar's handbrake.  Mr. Wolf determined that there was no defect in the condition or operating ability of the handbrake on AEX 7136.

32.    In its post-accident investigation, General Mills also retained Mr. Mo Draper, an employee of Barloworld.  Mr. Draper's particular area of expertise is trackmobile operations.  Mr. Draper was present for and participated in the various experimental tests performed by Mr. Wolf.

33.    Based upon its own investigation, General Mills failed to (i) properly train its employees in industry switching and trackmobile operation, (ii) provide chocks for use on railcars not coupled to the trackmobile, (iii) prevent untrained and uncertified individuals from operating the trackmobile and participating in industry switching, (iv) employ individuals with expertise in railcar switching operations to supervise, oversee, and conduct such operations, (v) establish policies and procedures for the inspection of railcars on its property and in its custody and control, (vi) monitor the activities of its employees in switching operations, (vii) provide required safety equipment, and (viii) enforce its own safety policies

regarding switching, chocking, derails, switching certification, and handbrake-efficiency testing.

34.     Pursuant to the Sidetrack Agreement, CSXT did not train, oversee, or conduct any of the switching operations conducted by General Mills on the General Mills portion of the private sidetrack.

35.     At the time of the incident, both Mr. Burchfield and Mr. Turk were (i) employed by General Mills, or one of its subsidiaries, (ii) performing their duties as employees of General Mills, or one of its subsidiaries, and (iii) acting within the course and scope of their employment at General Mills, or one of its subsidiaries. Also, in his capacity as a General Mills employee and while acting within the scope of his employment, Mr. Turk operated the trackmobile, even though Mr. Turk had not undergone the requisite training and was not certified to operate the trackmobile, and Mr. Burchfield, in the scope of his employment with General Mills, permitted Mr. Turk to do so.  Mr. Turk, in the scope of his employment with General Mills, continued with switching operations below AEX 7136, despite having seen the railcar move after it was uncoupled from the trackmobile.  Mr. Turk and Mr. Burchfield, in the scope of their employment with General Mills, conducted switching operations downgrade from AEX 7136 without taking any precautions, such as setting derailers or chocking the railcar.  Accordingly, General

Mills is responsible for the conduct of Mr. Burchfield and Mr. Turk on June 5, 2005, and the consequences thereof.

36.   Mr. Burchfield received workers' compensation payments for his injuries, and General Mills is immune from a damages claim from Mr. Burchfield for his injuries as a result of Georgia workers' compensation laws.

## PROCEDURAL HISTORY AND STATUS

37.   On June 1, 2007, Mr. Burchfield instituted a personal-injury action against CSXT and The Andersons (the owner of the railcar) in the United States District Court for the Northern District of Georgia, Civil Action No. 1:07-cv-1263 (TWT) (hereinafter referred to as the "Burchfield lawsuit").

38.   On June 18, 2007, CSXT tendered the defense of the Burchfield lawsuit to General Mills.  A true and correct copy of the June 18, 2007, tender of the defense letter is attached hereto and incorporated herein as **Exhibit B**.  By letter dated June 29, 2007, General Mills refused CSXT's tender of defense.  A true and correct copy of the June 29, 2007, refusal-of-defense letter is attached hereto and incorporated herein as **Exhibit C**.

39.   Despite the fact that General Mills's own internal analyses by two separate experts determined that the cause of the accident was the failure of General Mills's employees to properly engage the handbrake, to chock the wheels

of railcar AEX 7136, and/or to engage the manual derailer device, and that CSXT was not responsible for the incident, General Mills, ignoring its obligations under Sections 11 and 15 of the Sidetrack Agreement, continues to deny CSXT indemnification.

40.    General Mills was not a party to the Burchfield lawsuit, did not seek to intervene, and made only limited appearances in the Burchfield lawsuit to (i) move to quash and/or seek a protective order against discovery sought by Mr. Burchfield, and (ii) object and refuse to allow CSXT to obtain and introduce any oral and/or written testimony by Mr. Wolf or Mr. Draper as to the efficient operation of the hand brake, the failures of General Mills employees to follow its own procedures, and/or the tests performed post-accident that demonstrated that the handbrake on AEX 7136 was free from defect and worked efficiently.

41.    The Burchfield lawsuit resulted in a jury verdict in favor of CSXT on October 15, 2009, which was reversed by the United States Court of Appeals for the Eleventh Circuit on June 1, 2011.

42.    A retrial of the Burchfield lawsuit commenced on April 9, 2012, resulting in a jury verdict in favor of Burchfield, in the amount of $20,559,004.00.

43.    On June 26, 2012, CSXT made a demand for indemnification from General Mills for the full amount of the jury verdict.  A true and correct copy of

the June 26, 2012, demand for indemnification is attached hereto and incorporated herein as **Exhibit D**.

44.    On April 17, 2013, the jury verdict became a Final Judgment after the disposition of post-trial motions, and Mr. Burchfield filed a Notice of Appeal to the United States Court of Appeals for the Eleventh Circuit.  CSXT filed its own Notice of Appeal to the United States Court of Appeals for the Eleventh Circuit on May 6, 2013.

45.    On May 20, 2013, General Mills rejected CSXT's demand for indemnification on the ground that the Burchfield lawsuit was "not fully resolved" and stated that CSXT's demand therefore was "premature."  A true and correct copy of the May 20, 2013, response from General Mills is attached hereto and incorporated herein as **Exhibit E**.

46.    On May 30, 2013, CSXT again demanded indemnification from General Mills and invited General Mills to participate in mediation, required as part of the United States District Court of Appeals for the Eleventh Circuit appellate process, between Mr. Burchfield and CSXT.  A copy of the May 30, 2013, demand for indemnification is attached hereto and incorporated herein as **Exhibit F**.  General Mills refused.

47.    As a result of the court-ordered mediation, CSXT and Mr. Burchfield reached a settlement of the Burchfield lawsuit, requiring CSXT to remit $16,000,000.00 to Mr. Burchfield.  CSXT thereafter tendered full payment to Mr. Burchfield.

48.    On August 28, 2013, following the tender of payment to Mr. Burchfield, CSXT again demanded payment from General Mills, as indemnitor under the Private Sidetrack Agreement.  A copy of the August 28, 2013, demand for indemnification is attached hereto and incorporated herein as **Exhibit G**.

49.    By letter dated September 26, 2013, General Mills again refused to uphold its contractual indemnification obligation to CSXT.  A copy of the September 26, 2013, letter refusing indemnification is attached hereto and incorporated herein as **Exhibit H**.

50.    CSXT incurred significant costs, fees, and expenses in defending the Burchfield lawsuit and has incurred and continues to incur costs, fees, and expenses in prosecuting this action.

## COUNT I
## CONTRACTUAL INDEMNITY REGARDLESS OF FAULT, SECTION 15

51.    CSXT repeats, realleges, and incorporates by reference the allegations of paragraphs 1 through 50 of this complaint, as if fully set forth herein.

52.    Section 15 of the Sidetrack Agreement provides:

> Industry shall have the right to switch with its own trackmobile or locomotive power over Industry's Segment of the Sidetrack. . . . [I]n consideration therefor, Industry assumes <u>all</u> risk of loss, damage, cost, liability, judgment and expense, (including attorneys' fees) in connection with <u>any</u> personal injury to or death of any persons, or loss of or damage to any property, whether employees of either Industry or Railroad or third persons, or property of either Industry or Railroad or of other persons, that may be sustained or incurred in connection with, or arising from or growing out of, the operation of Industry's Trackmobile or locomotive power upon said Sidetrack.

Exhibit A at § 15.1 (emphasis in original).

53.     As its plain language reflects, General Mills's right to switch with its own trackmobile was separately bargained for, and the sole consideration for that right was the all-encompassing indemnification of CSXT.  In agreeing to permit General Mills to switch with its own trackmobile, CSXT gave up both (i) the revenue that it would otherwise have received for performing the switching operations using CSXT employees and equipment and (ii) control over the risks entailed in conducting switching operations.

54.     Section 15 of the Sidetrack Agreement—unlike Section 11's general allocation of liability for a broad range of possible occurrences—specifically covers all risk of loss, irrespective of cause, in connection with any incident arising out of General Mills's use of its own trackmobile, and requires General Mills to indemnify CSXT ***without regard to who ultimately might be determined to be at fault***.  Mr. Burchfield's injuries were incurred in connection with and/or arising

from the operation of General Mills's trackmobile over the General Mills portion of the private sidetrack.

55.    The Burchfield lawsuit arose directly out of General Mills's operation of its trackmobile upon the sidetrack and resulted in a jury verdict entered against CSXT in the amount of $20,559,004.00.

56.    Throughout the trial, retrial, and court-ordered mediation, CSXT provided notice to General Mills and afforded General Mills every opportunity to participate in the matter.  General Mills refused to participate and/or cooperate in good faith with the defense of the claim.

57.    Following court-ordered mediation, Mr. Burchfield and CSXT agreed to a settlement of the Burchfield lawsuit.  CSXT is entitled to indemnification from General Mills for such loss, damage, cost, liability, judgment, and expense, including attorneys' fees, incurred in the Burchfield lawsuit as well as all costs, fees, and expenses incurred in prosecution of this lawsuit.

58.    CSXT demanded indemnification from General Mills by letters dated June 18, 2007, June 26, 2012, May 30, 2013 and August 28, 2013, for all of its losses, damages, liability, judgment, and expenses, including attorneys' fees, in the Burchfield lawsuit.

59.    General Mills failed and refused to indemnify and hold harmless CSXT in this matter and, therefore, General Mills has breached Section 15 of the Private Sidetrack Agreement.

60.    As a direct result and consequence of General Mills's breach of Section 15 of the Private Sidetrack Agreement, CSXT has suffered damages.

**<u>COUNT II</u>**
**<u>CONTRACTUAL INDEMNITY WITH FAULT, SECTION 15</u>**

61.    CSXT repeats, realleges, and incorporates by reference the allegations of paragraphs 1 through 50 of this complaint, as if fully set forth herein.

62.    Pursuant to Section 15 of the Sidetrack Agreement, General Mills agreed to assume

> <u>all</u> risk of loss, damage, cost, liability, judgment and expense, (including attorneys' fees) in connection with <u>any</u> personal injury to or death of any persons, or loss of or damage to any property, whether employees of either Industry or Railroad or third persons, or property of either Industry or Railroad or of other persons, that may be sustained or incurred in connection with, or arising from or growing out of, the operation of Industry's Trackmobile or locomotive power upon said Sidetrack.

Exhibit A at § 15.1 (emphasis in original).

63.    Section 15 of the Sidetrack Agreement—unlike Section 11's general allocation of liability for a broad range of possible occurrences—specifically covers all risk of loss, irrespective of cause, in connection with any incident arising

out of General Mills's use of its own trackmobile, and requires General Mills to indemnify CSXT *without regard to who ultimately might be determined to be at fault*.

64.    Though the indemnity provision requires General Mills to indemnify CSXT regardless of fault, CSXT alleges, in the alternative, that General Mills is required to fully indemnify CSXT because General Mills bears at least *some* fault in causing Mr. Burchfield's injuries.

65.    Specifically, Mr. Burchfield's injuries were due, at least in part, to General Mills's own negligence by its failure to (i) properly train employees in industry switching and trackmobile operation, (ii) provide required chocks to use on railcars not coupled to the trackmobile, (iii) prevent untrained and uncertified individuals from operating the trackmobile and participating in industry switching, (iv) employ individuals with expertise in railcar switching operations to supervise, oversee, and conduct such operations, (v) establish policies and procedures for the inspection of railcars on its property and in its custody and control, (vi) monitor the activities of its employees in switching operations, (vii) provide required safety equipment, and (viii) enforce its own safety policies regarding switching, chocking, derails, switching certification, and handbrake efficiency testing.

66.     The Burchfield lawsuit arose directly out of General Mills's operation of its trackmobile upon the sidetrack and resulted in a jury verdict entered against CSXT in the amount of $20,559,004.00.

67.     Throughout the trial, retrial, and court-ordered mediation, CSXT provided notice to General Mills and afforded General Mills every opportunity to participate in the matter.  General Mills refused to participate and/or cooperate in good faith with the defense of the claim.

68.     Following court-ordered mediation, Mr. Burchfield and CSXT agreed to a settlement of the Burchfield lawsuit in the amount of $16,000,000.00.  CSXT is entitled to indemnification from General Mills for such loss, damage, cost, liability, judgment, and expense, including attorneys' fees, incurred in the Burchfield lawsuit as well as all costs, fees, and expenses incurred in prosecution of this lawsuit.

69.     CSXT demanded indemnification from General Mills by letters dated June 18, 2007, June 26, 2012, May 30, 2013 and August 28, 2013, for all of its losses, damages, liability, judgment, and expenses, including attorneys' fees, in the Burchfield lawsuit.

70.     General Mills failed and refused to indemnify and hold harmless CSXT in this matter and, therefore, General Mills has breached Section 15 of the Private Sidetrack Agreement.

71.     As a direct result and consequence of General Mills's breach of Section 15 of the Private Sidetrack Agreement, CSXT has suffered damages.

## COUNT III
## CONTRACTUAL INDEMNITY FOR 50% OF THE LOSS, SECTION 11

72.     CSXT repeats, realleges, and incorporates by reference the allegations of paragraphs 1 through 50 of this complaint, as if fully set forth herein.

73.     Though Section 15 requires General Mills to indemnify CSXT for all losses arising from or growing out of the use of General Mills's trackmobile, CSXT alleges, in the alternative, that General Mills is required to indemnify CSXT under Section 11 for 50% of the loss in the event that it is determined that Mr. Burchfield's injuries did not arise from or grow out of use of the trackmobile.

74.     Section 11.1 of the Private Sidetrack Agreement provides:

Except as otherwise provided herein, any and all damages, claims, demands, causes of action suits, expenses (including attorney's fees and costs), judgments and interest whatsoever (hereinafter collectively "Losses") in connection with injury to or death of any person or persons whomsoever (including employees, invitees and agents of the parties hereto) . . . arising out of or resulting directly or indirectly from the construction, maintenance, repair, use, alteration, operation or removal of the Sidetrack shall be divided between the two parties

as follows: . . . (B) The parties agree to jointly defend and bear equally between them all losses arising from their joint or concurring negligence.

75.    Throughout the trial, retrial, and court-ordered mediation, CSXT provided notice to General Mills and afforded General Mills every opportunity to participate in the matter.  General Mills refused to participate and/or cooperate in good faith with the defense of the claim.

76.    Following court-ordered mediation, Mr. Burchfield and CSXT agreed to a settlement of the Burchfield lawsuit in the amount of $16,000,000.00.  CSXT is entitled to indemnification from General Mills under Section 11 of the Private Sidetrack Agreement for 50% of the amount of such settlement as well as 50% of the attorneys' fees and costs incurred in the Burchfield lawsuit, as well as all costs, fees, and expenses incurred in prosecution of this lawsuit.

77.    CSXT demanded indemnification from General Mills by letters dated June 18, 2007, June 26, 2012, May 30, 2013 and August 28, 2013.

78.    General Mills failed and refused to indemnify and hold harmless CSXT in this matter and, therefore, General Mills has breached Section 11 of the Private Sidetrack Agreement.

79.    As a direct result and consequence of General Mills's breach of Section 11 of the Private Sidetrack Agreement, CSXT has suffered damages.

**WHEREFORE**, CSXT respectfully prays that the Court take the following action in this matter:

a. That judgment be entered in favor of CSXT and against General Mills on all claims asserted herein with costs and fees charged to General Mills;

b. That CSXT recover indemnification from General Mills for any and all losses, damages, costs, liabilities, judgment, and expenses, including attorneys' fees, in the Burchfield lawsuit, as well as all costs, fees, and expenses incurred in prosecution of this lawsuit;

c. That CSXT recover from General Mills all available damages due to General Mills's breaches of the Sidetrack Agreement;

d. That CSXT be awarded prejudgment interest from the date of General Mills's breach to the date of judgment, pursuant to O.C.G.A. § 13-6-13; and

e. That the Court grant further relief in favor of CSXT and against General Mills that the Court deems proper and just.

Respectfully submitted this 24th day of April, 2017.


GUNSTER, YOAKLEY & STEWART, P.A.

By:    /s/ *Ana Johnson*
       Ana Johnson, GA Bar No. 240127
       ajohnson@gunster.com
       225 Water Street, Suite 1750
       Jacksonville, Florida 32202-5185
       (904) 350-7175


JAX_ACTIVE 3815931.2