IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CSX TRANSPORTATION, INC.,

    Plaintiff,

      v.

GENERAL MILLS, INC.,

    Defendant.

CIVIL ACTION FILE
NO. 1:14-CV-201-TWT

## OPINION AND ORDER

This is a breach of contract action. It is before the Court on the Defendant's Motion for Summary Judgment [Doc. 238]. For the reasons set forth below, the Court DENIES the Defendant's Motion for Summary Judgment [Doc. 238]. In so holding, the Court resolves two related *Daubert* motions filed by the Defendant: the Defendant's Motion in Limine to Exclude Opinion Testimony of Plaintiff's Expert Samuel J. Gualardo [Doc. 235] is GRANTED, and the Defendant's Motion in Limine to Exclude Standard-of-Care Opinion Testimony of Plaintiff's Expert Brian Heikkila [Doc. 236] is DENIED.

## I.   Background[1]

---

[1] The operative facts on the Motion for Summary Judgment are taken from the movant's Statement of Undisputed Material Facts and the responses thereto. The Court will deem the movant's factual assertions, where supported by evidentiary citations, admitted unless the respondent makes a proper objection under Local Rule 56.1(B).

The facts of this case are well known to the parties, and the Court will summarize only the relevant ones here. On June 5, 2005, General Mills employee Doug Burchfield sustained the partial amputation of both legs in a rail car accident that occurred after he and another employee, Rodney Turk, were moving rail cars on a sidetrack at General Mills's cereal plant in Covington, Georgia. (Def.'s Statement of Material Facts ¶¶ 1, 4). As a result of the accident, in June 2007, Mr. Burchfield filed a personal injury lawsuit against CSX that ultimately resulted in a verdict against CSX. (*Id.* ¶¶ 5, 7). The present action followed. The Plaintiff contends that the Defendant caused or contributed to causing the accident in several ways, including permitting employees to operate the Trackmobile and conduct switching without ensuring they set and checked handbrakes on the rail cars or used chocks and derailers during switching. (*Id.* ¶ 10). To establish the requisite standard of care to support the contention that Mr. Burchfield and Mr. Turk's failure to perform these actions, among others, was negligent, the Plaintiff relies on opinion testimony of its retained experts Samuel Gualardo and Brian Heikkila. (*Id.* ¶ 12). The Defendant has moved to exclude the testimony of both experts and for summary judgment on the ground that, if this expert testimony is excluded, the Plaintiff will be unable to meet its burden of proof with regard to the standard of care for its claims that the Defendant's negligence caused or contributed to the accident.

## II. Legal Standards

### A. *Daubert* Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under that rule, "expert testimony is admissible if (1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014) (quotation marks and citation omitted). The Federal Rules of Evidence require a district judge to undertake a gatekeeping function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "In considering the proffered expert testimony, a trial judge is mindful the burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *Chapman*, 766 F.3d at 1304 (quotation marks and punctuation omitted).

### B. Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and draw any inferences in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).

The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

## III.   Discussion

### A.  The Defendant's Motions in Limine

The Court touched on the standard of care applicable to General Mills during the *Burchfield* litigation in ruling on Burchfield's motion for summary judgment as to General Mills's fault in the accident. In ruling that expert testimony was required to establish the applicable standard of care, the Court held that "the facts and issues in this case require a more technical and specialized knowledge [of railroad switching operations] than exists in common understanding." *Burchfield v. CSX Transp., Inc.*, 2009 WL 1405144, at *11 (N.D. Ga. May 15, 2009). The Court rejected CSX's contention that the jury could determine the standard of care from the Trackmobile manual, stating that "although the handbook is certainly instructive for establishing a duty, it is not necessarily sufficient." *Id.* While the Court's prior rulings were based in part on the fact that "[a] more particularized showing of the standard of care [is] necessary in Federal Employee Liability Act cases," the present action calls for the same specialized and technical knowledge. *See id.* at 10. The same standard of care issue presents itself here, and knowledge of proper railroad switching operations is beyond what "exists in common understanding" amongst jurors. *Id.* at 11.

4

Accordingly, the Court reaffirms its prior holdings that the parties' presentation of "conflicting evidence about the standard of care indicates the issue cannot be reduced to whether or not General Mills followed an instruction manual" and, therefore, "the proper use of safety appliances on the track requires technical and specialized knowledge." *Id.* at 11. The Court considers the Defendant's Motions in Limine against this backdrop.

### 1. Gualardo's Testimony

The Defendant moves to exclude Gualardo's testimony on the grounds that (1) he is not qualified to opine on the standard of care applicable to railcar switching operations; (2) his opinions are not supported by sufficient facts or data; and (3) he did not follow reliable principles and methods in formulating his opinions. (Def.'s Br. in Supp. of Def.'s Mot. to Exclude Gualardo, at 6-25).

Turning to the Defendant's first ground for exclusion, Rule 702 provides that a witness may be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. When assessing a witness's qualifications, the district court must focus on "the matter to which the expert seeks to testify—i.e., 'to the task at hand.'" *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021) (quoting *Daubert*, 509 U.S. at 597). While a witness may be "well-trained, highly educated, and experienced" with an "impressive professional track record," Rule 702 contemplates "a more thorough analysis of whether [the witness] is qualified and competent to testify as an expert *as to the subject matter of his proposed testimony.*" *Jack v. Glaxo Wellcome, Inc.*, 239 F. Supp. 2d 1308, 1316 (N.D. Ga. 2002) (emphasis

5

added). "It is for that reason that 'expertise in one field does not qualify a witness to testify about others.'" *Moore*, 995 F.3d at 854 (quoting *Lebron v. Sec'y of Fla. Dep't of Children & Families*, 772 F.3d 1352, 1368 (11th Cir. 2014)). The question whether a proposed witness is qualified to testify as an expert rests within the district court's discretion. *Jack*, 239 F. Supp. 2d at 1314 (citing *Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976)).

The Defendant argues that Mr. Gualardo is not qualified to serve as an expert because he has almost no training or experience in railroad operations. (Def.'s Br. in Supp. of Def.'s Mot. to Exclude Gualardo, at 7). According to the Defendant, Gualardo's sole experience with switching railcars came from 1982 to 1987 when he worked with a railroad expert, James Laubach, to develop a Trackmobile training program at Hershey Chocolate USA ("Hershey"). (*Id.*) During his deposition, Mr. Gualardo testified that Hershey hired Mr. Laubach based on his "superior knowledge of railroad operations" specifically to help create the training program. (Gualardo Dep. at 29:16-30:6). Although Mr. Gualardo was trained to operate the Trackmobile at the time, he testified that he never used the machine again after his training and could not recall all of the steps involved in switching railcars. (*Id.* at 79:7-81:8). When asked in particular about how to set and test railcar brakes, Mr. Gualardo repeatedly responded that "this is going back 40 years" and "I can't remember the specifics of that." (*Id.* at 86:5-87:24). The Court agrees with the Defendant that this single,

limited, and now-distant experience does not, on its own, permit Mr. Gualardo to testify on the standard of care for switching operations.[2]

Nor does Mr. Gualardo's expert report or CV provide any other basis on which to admit him as an expert in this case. The body of Mr. Gualardo's report contains no discussion whatsoever about any training or experience in railcar switching operations. In support of his expert opinions, Mr. Gualardo relies on voluntary industry standards, Barloworld training materials, the Trackmobile operations manual, and federal regulations, but he never references his personal experience as evidence that General Mills' training and safety protocols deviated from industry standards. (*See generally* Gualardo's Report at 4-18 [Doc. 235-2]). While the appendix includes a cursory "Witness Qualifications" section with Mr. Gualardo's education, professional certifications, and workplace inspection history, none of the bulleted entries specifically relate to the subject matter of his proposed testimony (*id.* at 36-37), nor has Mr. Gualardo ever served as an expert witness in another case regarding railroad operations or equipment. (Gualardo Dep. at 75:3-6.) Mr. Gualardo's CV similarly describes his career in workplace safety and regulatory

---

[2] Importantly, the relevant details about Mr. Gualardo's Trackmobile experience at Hershey only came to light as a result of his deposition; nowhere in either his expert report or CV did Mr. Gualardo disclose that he helped create a Trackmobile training program at Hershey. But Rule 26 does not allow parties "to cure deficient expert reports by supplementing them with later deposition testimony." *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008). Therefore, even if Mr. Gualardo's Hershey experience alone qualified him as an expert, it is doubtful that the Court could consider his post-report deposition testimony describing that experience.

compliance but does not so much as hint at any specialized knowledge in railroad operations.[3] (*See generally* Gualardo's CV at 1-2). *See Lebron*, 772 F.3d at 1368 ("Expertise in one field does not qualify a witness to testify about others.").

Faced with the barebones qualifications in Mr. Gualardo's report, the Plaintiff directs the Court's attention elsewhere in an effort to reinforce his expert credentials. (*See generally* Pl.'s Br. in Opp'n to Def.'s Mot. to Exclude Gualardo, at 27-30 (citing Gualardo's report only once in a footnote as support for his qualifications)).[4] First, the Plaintiff provides a new 10-page declaration from Mr. Gualardo that describes his "extensive experience" in developing, evaluating, and implementing safety policies for industry sidetracks and railcar movements. (*Id.* at 29). While the job positions discussed in the declaration match up with Mr. Gualardo's CV, none of the relevant details about his railroad-specific duties appear in either his CV or expert report. (*Compare* Gualardo Decl. [Doc. 243-26] ¶¶ 12–20, *with* Gualardo Report at 36-38, *and* Gualardo CV [Doc. 235-5] at 1-2). Next, the Plaintiff attempts to shift the blame to the Defendant for failing to proactively seek out more information about Mr. Gualardo's training and experience. (Pl.'s Br. in Opp'n to Def.'s Mot. to Exclude Gualardo, at 28). According to the Plaintiff, the Defendant did not ask any questions during Mr. Gualardo's deposition about his decades-long career with the

---

[3] The shortcomings in Mr. Gualardo's stated qualifications are all the more glaring when compared to the unchallenged credentials of the Plaintiff's other standard-of-care expert, Mr. Heikkila. *See infra* Section III.A.2.

[4] The Plaintiff filed a consolidated response brief responding to the Defendant's Motions in Limine as well as its Motion for Summary Judgment. [Doc. 243].

Occupational Safety and Health Administration, during which he allegedly created and inspected safety programs for numerous industrial facilities with sidetracks. (*Id.*).

As an initial matter, the Defendant is not at fault for the Plaintiff's failure to comply with expert disclosure requirements, no matter how much or little the Defendant questioned Mr. Gualardo's qualifications during his deposition. Federal Rule of Civil Procedure 26(a)(2)(B) requires that all retained expert witnesses prepare a signed, written report that contains, *inter alia*, "the witness's qualifications, including a list of all publications authored in the previous 10 years[.]" "A party must make these disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). This rule is designed to provide the opposing party "reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." *Reese v. Herbert*, 527 F.3d 1253, 1265 (11th Cir. 2008) (quotation marks and citation omitted). If a party fails to provide information or identify a witness as required by Rule 26(a), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

The Defendant was entitled to an expert report in conformity with Rule 26(a)(2). As numerous courts have recognized, nothing in the Federal Rules of Civil Procedure or the case law required the Defendant, when presented with an inadequate report, to "ferret out" what the Plaintiff failed to provide, nor should the Defendant be penalized for "not rescuing the [Plaintiff] from the consequences of its

9

omission." *Bolton v. WJV Miss., Inc.*, 2011 WL 206171, at *4 (S.D. Ala. Jan. 20, 2011); *see also Berryhill v. Village of Streamwood*, 2004 WL 1444879, at *5 (N.D. Ill. June 28, 2004) ("Plaintiff was entitled to a report in conformity with the Rule and is not required to effectively bail out the defendants by taking Nixon's deposition and thereby rendering the violation harmless."); *New Colt Holding Corp. v. RJG Holdings of Fla., Inc.*, 2003 WL 23508131, at *1 n.2 (D. Conn. Aug. 11, 2003) (dismissing as "without merit" an argument that "plaintiffs may not move to exclude unless proposed experts are first deposed"). Even so, Mr. Gualardo's deposition transcript reveals that the Defendant asked at length about his education and employment history. (Gualardo Dep. at 11:19-44:11.) In fact, some of Gualardo's responses to the Defendant's questions are directly contradicted in his declaration: for example, Gualardo testified that he did not create or review sidetrack procedures at Metropolitan Edison Company and could not recall if company employees actually moved railcars, whereas his declaration now states that he and his team there "evaluated, developed and/or implemented extensive policies and procedures to prevent line of fire exposures caused by railcar movements." (*Compare* Gualardo Dep. at 34:14-38:14, *with* Gualardo Decl. ¶ 17).

Worrisome contradictions aside, the Plaintiff is not allowed to cure deficiencies in Mr. Gualardo's expert report by submitting a belated declaration with new details about his railroad experience. Again, Rule 26(a)(2) requires that an expert disclose his qualifications at the time ordered by the district court. Meanwhile, Local Rule 26.2(C) and Rule 37(c) "mandate the exclusion of additional, late expert material

unless [the] Plaintiff can meet [its] burden to show that the tardy disclosure was *substantially justified* or *harmless.*" *Showan v. Pressdee*, 2017 WL 8781045, at *3 (N.D. Ga. July 13, 2017) (emphasis added) (granting a motion to strike an expert witness's "late-disclosed affidavit and declin[ing] to consider it when weighing [the opposing party's] motion to exclude his testimony"). It is undisputed that Mr. Gualardo's declaration was provided more than a year after the expert disclosure deadline, [Doc. 186], and approximately two months after the expert deposition deadline, [Doc. 220], in this case. However, the Plaintiff makes no argument as to why this late-breaking disclosure is "substantially justified" or "harmless," especially when the declaration's contents were presumably known to the Plaintiff at the time of his report. The Court will not then consider the declaration in weighing Mr. Gualardo's qualifications.[5]

For the foregoing reasons, the Defendant's Motion to Exclude Mr. Gualardo should be granted. Because Mr. Gualardo's expert report and CV do not demonstrate

---

[5] This is not a matter of elevating form over function. As the Eleventh Circuit has observed, "[b]ecause the expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, compliance with the requirements of Rule 26 is not merely aspirational." *Cooper v. Southern Co.*, 390 F.3d 695, 728 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457-58 (2006); *see also Ciomber*, 527 F.3d at 642 ("The purpose of Rule 26(a)(2) is to provide notice to opposing counsel—before the deposition—as to what the expert witness will testify, and this purpose would be completely undermined if parties were allowed to cure deficient reports with later deposition testimony." (citation omitted)). A party's failure to comply with Rule 26 can have disruptive effects, as exhibited in this case: the Defendant has already taken Mr. Gualardo's deposition and moved to exclude his testimony without the benefit of information that, the Plaintiff now claims, qualifies Mr. Gualardo as an expert in railcar switching operations.

any experience, training, or knowledge in railroad operations, none of his proposed expert opinions are admissible at trial, and the Court need not consider the Defendant's alternative grounds to exclude his testimony. *See Chapman*, 766 F.3d at 1304 ("[E]xpert testimony is admissible if, [*inter alia*], the expert is qualified to testify regarding the subject of the testimony."). The Court pauses to address General Mills's contention, raised in its reply brief, that the declaration of CSX Transportation Training Director John Barnette should be stricken. (Def.'s Consol. Reply Br., at 1 n.1.).

The Defendant is flatly incorrect that CSX did not timely disclose Mr. Barnette as a potential expert witness in its disclosures. [*See* Doc. 186; Doc. 191 at 6-7 (listing Mr. Barnette under a section regarding expert witnesses and noting that he "may be called upon to testify as a hybrid [expert and Rule 30(b)(6) corporate representative] witness at trial.")]. According to the Plaintiff, because Mr. Barnette's employment duties do not regularly involve giving expert testimony, Rule 26's expert report requirement does not apply. Fed. R. Civ. P. 26(a)(2)(B) ("[T]his disclosure must be accompanied by a written report . . . if the witness is one retained or specially employed to provide expert testimony in the case or *one whose duties as the party's employee regularly involve giving expert testimony*."). However, Rule 26(a)(2)(C) still requires disclosures for witnesses who are not required to provide a written report to state (1) the subject matter on which the witness is expected to present expert evidence, and (2) "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). The Plaintiff's supplemental

disclosures pass muster as to the first prong but fall short as to the second. The disclosure states only that "Mr. Barnette will testify as CSXT's 30(b)(6) corporate representative as to the appropriate training and switching protocol and procedures on industry sidetracks," which is an accurate description of the declaration's subject matter. [Doc. 191 at 7]. This statement cites neither facts nor opinions, in particularly stark opposition to the opinions Mr. Barnette gives in his declaration about General Mills' training and switching protocols compared to that of CSX. [*See, e.g.*, Barnette Decl. ¶¶ 20-24]. Contrary to the Plaintiff's contention, the fact that the Defendant did not argue the Rule 26(a)(2)(C) requirements is of no merit because the Plaintiff is required to comply with Rule 26's mandates regardless. *Cooper*, 390 F.3d at 728 ("[C]ompliance with the requirements of Rule 26 is not merely aspirational."). The Plaintiff gave no explanation for its insufficient disclosure other than stating it believed the disclosure was sufficient, and the Plaintiff did not update its disclosure to list Mr. Barnette as a potential expert witness until the last day of the deadline, two days after the Defendant had already deposed him solely as a Rule 30(b)(6) witness. *See Serendipity at Sea, LLC v. Underwriters at Lloyd's of London*, 2024 WL 2830627, at *4 (11th Cir. June 4, 2024) (the factors of the harmlessness inquiry include the party's explanation for its failure to disclose, the importance of the testimony, and the prejudice to the opposing party). Thus, because the Plaintiff's Rule 26(a)(2)(C) disclosure as to Mr. Barnette was inadequate and the error was not harmless, the Court will strike Mr. Barnette's declaration pursuant to Rule 37(c)(1).

13

## 2. Heikkila's Testimony

The Defendant moves to exclude Mr. Heikkila's opinions related to training and supervision, derailers, and the Trackmobile horn on the ground that the methodology exhibited in his expert report is not reliable. (Def.'s Br. in Supp. of Def.'s Mot. to Exclude Heikkila, at 8-14).

Expert testimony is admissible under Rule 702 if, *inter alia*, (1) "the testimony is based upon sufficient facts or data"; (2) "the testimony is the product of reliable principles and methods"; and (3) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. To that end, the district court is tasked with evaluating "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. *Daubert* sets forth a number of factors relevant to this inquiry, including (1) whether an expert's theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of a scientific technique; and (4) whether a known technique has achieved widespread acceptance in the scientific community. *Id.* at 593-94. These factors are not, the Supreme Court has emphasized, intended to be a "definitive checklist," *id.* at 593; rather, "the law grants the trial judge broad latitude to determine . . . whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case[.]" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999).

Like the Supreme Court, the Eleventh Circuit has advocated a "flexible, context-sensitive application of *Daubert*," recognizing that in certain cases, the question of whether an expert opinion is reliable may turn more on the expert's competency than his methodology. *Adams v. Lab'y Corp. of Am.*, 760 F.3d 1322, 1340 (11th Cir. 2014) (Garza, J., concurring). Thus, "there are instances in which a district court may determine the reliability prong under *Daubert* based primarily upon an expert's experience and general knowledge in the field[.]" *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1336 (11th Cir. 2010). One such instance is standard-of-care testimony, which generally arises from professional, empirical judgment rather than scientific study. *See, e.g.*, *Adams*, 760 F.3d at 1330 (noting a standard-of-care expert's "application of her extensive, relevant experience contributed to the reliability of her methodology"); *Anderson v. Techtronic Indus. N. Am., Inc.*, 2015 WL 12843836, at *4 (M.D. Fla. Apr. 15, 2015) ("The type of opinion at issue here—essentially a failure to adhere to a certain standard of care—is precisely the type of opinion where experience may be appropriately relied upon."); *see also Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 982 (6th Cir. 2004) (holding the district court abused its discretion in excluding a doctor's standard-of-care testimony that was "supported by extensive relevant experience").

Still, "the qualifications and reliability prongs of *Daubert* are conceptually distinct inquiries that district courts may not collapse into each other." *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 853 (11th Cir. 2021). "[E]ven in cases where the reliability determination turns primarily on an expert's experience, 'the district court

15

must still determine the reliability of the opinion, not merely the qualifications of the expert who offers it.'" *Adams*, 760 F.3d at 1330 n.13 (quoting *Kilpatrick*, 613 F.3d at 1336). Echoing this principle, the advisory committee note to Rule 702 states:

> [i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it." *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough.").

Fed. R. Evid. 702 advisory committee's note to 2000 amendments. Ultimately, the district court's objective under *Daubert* is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152.

With respect to Mr. Heikkila, the Defendant does not challenge—and for good reason—his qualifications to offer standard-of-care testimony in this case. Over a more than four-decade career, Mr. Heikkila has held positions with multiple railroad companies as, *inter alia*, a switchman, brakeman, conductor, locomotive engineer, and director of training rules and safety. (Heikkila Report, App'x A at 2-3). He represents that in his role as a railroad officer, he has trained, qualified, and supervised hundreds of switchmen, locomotive engineers, and railroad supervisors, as well as mechanical employees tasked with moving railcars by Trackmobile. (*Id.* at 1-2.) He has also developed, implemented, and managed safety and rules programs

16

for switchmen, among other positions, and investigated hundreds of railroad accidents and incidents, serving as an expert witness in numerous railroad-related cases in federal and state court. (*Id.* at 1-2; *id.*, App'x B). There is no doubt then that Mr. Heikkila's expert opinions are admissible under the first prong of Rule 702.

In preparing his expert report, Mr. Heikkila conducted a site inspection at the Covington plant on February 3, 2020, (*id.* at 2), and reviewed a list of more than 230 materials, including case pleadings, incident reports and statements, photographs and videos, equipment manuals, expert reports, and depositions and trial testimonies. (*Id.*, App'x C). The report presents Mr. Heikkila's findings and opinions over 19 sections, of which the Defendant argues three opinions contained in four sections are not reliable. The Court addresses each of the Defendant's grounds to exclude those opinions in turn below.

### a. Training and Supervision Opinions (Sections 18 and 19)

Most of the opinions in Mr. Heikkila's expert report concern the allegedly inadequate training and supervision provided to General Mills switching crews.[6] The Defendant contends that these opinions are inadmissible because Mr. Heikkila does not specifically explain (1) what the standard of care was for training switchmen at

---

[6] As with Mr. Gualardo, the Plaintiff submits a new declaration from Mr. Heikkila with its response brief summarizing the opinions in his report. On the Court's reading, none of the details contained in Mr. Heikkila's declaration materially differ from or add to his report. Still, the Plaintiff does not make the case that this tardy disclosure is substantially justified or harmless under Rule 37(c), and the Court thus will strike it and not consider it in resolving the Defendant's Motion to Exclude Mr. Heikkila.

the time of the accident and (2) how the Defendant's training program deviated from that standard of care. (Def.'s Br. in Supp. of Def.'s Mot. to Exclude Heikkila, at 8-9.)

Upon review of the report, the Court does not find Mr. Heikkila's opinions to be as vague as the Defendant claims. Throughout his report, Mr. Heikkila describes a number of switching skills and duties that the Defendant should have trained its employees to perform, including:

- "The standard of care within the railroad industry for qualifying railroad employees to safely handle rail equipment typically includes several days or even weeks of classroom training on the applicable rules, procedures[,] safety requirements[,] and equipment operation, followed by a period of on the job training under the supervision of a qualified supervisor and/or coworker. The process should also include written as well as applied skills performance tests to ensure an employee has the necessary knowledge and ability to safely do the work required of a switch crew before deeming them qualified to do so. Also, in a properly managed switching operation, periodic retraining and testing should be provided on a recurring basis along with ongoing performance audits referred to as "efficiency" or "operations" tests, conducted by qualified supervisors to ensure the employees are properly performing their switching duties." (Heikkila Report at 15.)
- "[T]he crew apparently held no job safety briefing prior to commencing their switching activities, despite Mr. Turk's inexperience and the fact they would be handling equipment on trackage that features a descending grade southward that increases from essentially level track near the rail shed to approximately 2% as it descends southward toward the CSXT main line." (*Id.* at 5-6.)
- "In the railroad industry, descending grades require added caution by crews responsible for handling and securing rail equipment on them to ensure speeds are kept under control and any standing equipment left unattended is properly secured with handbrakes to prevent rollouts. Derails are also used in selected locations on industrial tracks and are normally kept in derailing position to prevent access to those tracks, and to stop roll-outs except when lined to permit an intended movement." (*Id.* at 6.)
- "As a railroad industry standard, the use of a handbrake or wheel chocks is required when leaving a rail car unattended, and it is never

permissible to rely solely on the airbrakes since they may leak off and release at some point which can result in unintended car movement, particularly on grades." (*Id.* at 8.)

- "Where derails are available, [General Mills] switch crews should have been trained to use them." (*Id.* at 11.)
- Mr. Turk's [sic] should have immediately sounded the [T]rackmobile's warning horn, and also provided a verbal warning over the radio, which would have given Mr. Burchfield a much better opportunity to hear the warnings and move out of the way prior to the collision." (*Id.* at 15.)

Moreover, the report describes the level of training provided to the Defendant's employees and, in particular, Mr. Turk, who was operating the Trackmobile on the day of the accident:

- It should be noted that [General Mills] materials handling technicians called upon to perform switching duties at the Covington plant did so in addition to performing a variety of other unrelated tasks. The record shows they received only minimal training to prepare them for this work that included a classroom instruction session covering basic safety and equipment topics, including [T]rackmobile operations, followed by a quiz and a hands-on field training component, with little to no supervision or oversight thereafter to ensure they were proficient in performing their switching duties safely." (*Id.* at 4.)
- "It is undisputed that Mr. Turk had received no formal [T]rackmobile training and he admitted to having only limited knowledge about the [T]rackmobile and rail car switching. The General Mills [T]rackmobile log reflects that he had performed switching with Mr. Burchfield three times over the past year, and although not mentioned in the log, Mr. Turk claims he also had a brief ride-along with a [T]rackmobile operator a couple weeks prior to the accident." (*Id.* at 5.)
- "Mr. Turk testified that since he had little prior experience and was in training that day, it was '*all new to him*', so he relied on and followed Mr. Burchfield's instructions during the shift." (*Id.* at 7.)
- "[D]ue to his inexperience and lack of training in rail operations at the time, Mr. Turk was unaware that rail cars such as AEX 7136 are only equipped with a handbrake on the B-End, which was the south end of the car that was facing him . . . . Mr. Turk later testified that he . . . had only learned since the accident that it was not permissible

to rely solely on car air brakes when leaving cars unattended. Mr. Turk also testified that if he had known then what he had since learned through the additional training and experience he has received, he would have made sure the handbrake on AEX 7136 was applied that day after seeing the car move." (*Id.* at 7-8.)

- "As discussed in this report, the actual training, documentation and safety oversight of its switch crews by General Mills was inadequate at the time of this accident and there was also a lack of proper documentation of their rules, procedures, work practices, and training records." (*Id.* at 14.)

- "At the time of this accident, [General Mills] failed to staff the switch crew with two qualified employees. The fact that Mr. Burchfield was required to supervise and train the inexperienced Mr. Turk meant that his attention was divided rather than focused as it should have been on the safe performance of his ground duties." (*Id.*)

- "[General Mills] should have emphasized to its switch crews that railcars left standing unattended within the plant must be secured with handbrakes. They should have also monitored crew compliance with this requirement on an ongoing basis, but failed to do so." (*Id.*)

- "[General Mills] should have trained its switch crews to know and understand the tracks within the Covington [p]lant feature a significant descending grade of 2.0% between the rail shed and CSX main line which poses a heightened risk of roll-outs if standing rail cars are not properly secured, but failed to do so." (*Id.*)

- "When responding to the accident on June 5, 2005, CSXT Roadmaster Lawrence Jeffords who later became a safety inspector with the Federal Railroad Administration (FRA), discovered a widespread absence of applied handbrakes on standing rail cars in the GM yard, which prompted him to personally apply handbrakes on a number of unsecured cars to protect the derailment response work being done down below. This discovery by Mr. Jeffords further indicates General Mills' failure to provide adequate equipment securement training and compliance for their rail operations at that time." (*Id.*)

- "[S]ince Mr. Turk had received no such training from [General Mills] [about sounding the Trackmobile horn and providing a radio warning during roll-outs], these options did not occur to him." (*Id.* at 15.)

As these passages demonstrate, the Defendant's broad-brush efforts to paint Mr.

Heikkila's report as imprecise or speculative do not pass muster.

20

To be sure, Mr. Heikkila could have included more specifics about the General Mills training and safety protocols in his report, but that argument bears less on the reliability of his opinions and more on the credibility and weight of his testimony. "It is true that relevant testimony from a qualified expert is admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988). However, "as long as a logical basis exists for an expert's opinion . . . the weaknesses in the underpinnings of the opinion[] go to the weight and not the admissibility of the testimony." *Id.* at 663. Not only does Mr. Heikkila describe aspects of Mr. Turk's training that, in his view, were below industry standards, but he also reviewed specific training materials from General Mills and other industry sources in reaching this conclusion. (Heikkila Report, App'x C, at 4-6). Any remaining issues about Mr. Heikkila's credibility "are questions of fact which require resolution by the trier of fact." *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986).

Next, the Defendant takes issue with Mr. Heikkila's opinion that General Mills should have trained employees on the descending grade between the rail shed and the CSX main line. (Def.'s Br. in Supp. of Def.'s Mot. to Exclude Heikkila, at 9). According to the Defendant, this opinion "is not grounded in fact" because (1) the General Mills sidetracks do not have an "unusually steep" grade and (2) Mr. Turk was aware of the grade at the time of the accident. (*Id.* at 9-10.) But Mr. Heikkila based his opinion on the fact that there is a two-percent decline in the General Mills sidetrack, not on some subjective measure like "unusually steep." (Heikkila Report at

21

5-6.) Even the Defendant's own expert testified that a two-percent grade is a "serious dropoff of a railroad." (Fulk Dep. at 114:12-115:6). Moreover, regardless of whether Mr. Turk knew about the descending grade at the Covington plant before the accident, Mr. Heikkila's opinion is that Mr. Turk and Mr. Burchfield were not properly trained to apply handbrakes and set derailers to avoid railcar rollouts. (Heikkila Report at 6, 14). Accordingly, the Court disagrees with the Defendant that Mr. Heikkila's descending-grade opinion is at odds with the facts of this case.

The Defendant also seeks to exclude this opinion on the ground that it "is not the product of any reliable methodology." (Def.'s Br. in Supp. of Def.'s Mot. to Exclude Heikkila, at 10). In support, the Defendant claims that Mr. Heikkila failed to "explain how he factored in that upon seeing the AEX 7136 move and knowing that the railcar was on a slope, Mr. Turk asked Mr. Burchfield if he set the brake, and Mr. Burchfield confirmed that he had." (*Id.*). To the contrary, the Court finds that Mr. Heikkila expressly addresses this series of events in his report and explains how additional training could have still avoided the accident. According to the report, Mr. Turk incorrectly assumed that Mr. Burchfield had set the handbrake on AEX 7136 when he walked out-of-view to the A-End of the railcar. (Heikkila Report at 7-8). What Mr. Turk did not realize—"due to his inexperience and lack of training"—was that railcars like AEX 7136 are only equipped with a handbrake on the B-End, which was facing Mr. Turk on the Trackmobile. (*Id.* at 7). For these reasons, Mr. Heikkila concludes that Mr. Burchfield likely only set the airbrakes, not the handbrake, on

AEX 7136, and that Mr. Turk would have corrected this mistake had he known about the placement of the handbrake.[7] (*Id.* at 8).

Therefore, the Court determines that Mr. Heikkila's training and supervision opinions are "properly grounded, well-reasoned, and not speculative" and may be offered at trial. Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

### b.  Derailer Opinion (Sections 5 and 13)

In his expert report, Mr. Heikkila states that General Mills switch crews should have been trained to set derailers where available to prevent rollout collisions. (Heikkila Report at 11). The Defendant contends that this opinion is not reliable because Mr. Heikkila cites no "reference materials" to support using derailers during railcar switching operations. (Def.'s Br. in Supp. of Def.'s Mot. to Exclude Heikkila, at 12-13). Moreover, the Defendant emphasizes that CSXT prohibits its own employees from using derailers mid-switching due to the risk of dangerous derailments. (*Id.* at 13 (citing Barnette Dep. at 58:2-59:13)). According to the Defendant, any reliable methodology would have to account for such contradicting policies and countervailing dangers; otherwise, Mr. Heikkila is simply presenting his

---

[7] In forming his opinion, Mr. Heikkila relies in part on Mr. Turk's testimony, in which he affirmed that (1) he would have seen Mr. Burchfield apply the handbrake on AEX 7136 if he had done so; (2) he had only learned since the accident that it was not permissible to rely solely on airbrakes when leaving railcars unattended; and (3) he would have made sure the handbrake on AEX 7136 was applied after seeing the railcar move with the benefit of additional training and experience. (Turk Dep., 115:13-116:13; 123:4-124:7).

own viewpoint with respect to derailers without drawing a connection to the applicable standard of care. (*Id.* at 14).

However, the Court disagrees with the Defendant that there is "simply no factual support" for Mr. Heikkila's derailer opinion. (*Id.* at 13). While Mr. Heikkila does not cite any reference materials in the body of his report, he did consult several Trackmobile training and safety manuals and other industry training courses in preparation of the report. (Heikkila Report, App'x C at 4-6). He also articulates a rational connection, applying his extensive experience and knowledge, between his derailer opinion and the particular switching operations at the Covington plant. First, he advocates for a heightened standard of care here because General Mills employees are not dedicated railroad workers but are "called upon to perform switching duties . . . in addition to performing a variety of other unrelated tasks."[8] (*Id.* at 4). Next, he remarks that the descending grade on the General Mills sidetracks requires crews to exercise "added caution," including setting derailers "to stop roll-outs except when lined to permit an intended movement." (*Id.* at 6). From this premise, Mr. Heikkila reconstructs the sequence of railcar movements leading up to the accident and concludes that Mr. Turk and Mr. Burchfield should have been trained to use derailers during this process. (*Id.* at 7, 11).

---

[8] As evidence, Mr. Heikkila points out that Mr. Turk had performed switching operations with Mr. Burchfield only three times in the year leading up to the accident. (Heikkila Report at 5).

24

While Mr. Heikkila's report does not address contradictory CSXT policy on derailers, this objection again bears on the weight and accuracy of his testimony rather than the reliability of his methodology. *See, e.g., Adams*, 760 F.3d at 1334-35 (holding "[t]he risk of bias would mean, at most, that [the expert's] testimony is to some extent 'shaky,' and shakiness goes to the weight of her testimony, not its admissibility"); *Watt v. Butler*, 744 F. Supp. 2d 1315, 1320 (N.D. Ga. 2010) (finding an expert's failure to consider alternative evidence "go[es] to the weight and accuracy of [his] testimony, not the reliability of his methodology") The Defendant will have an opportunity to challenge Mr. Heikkila's derailer opinion at trial by drawing out the differences between CSXT policy and his proposed standard of care; however, the Court's inquiry at this stage "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. As the Eleventh Circuit has repeatedly stressed, Rule 702 "is not intended to supplant the adversary system or the role of the jury: vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (quotation marks and citation omitted).

Therefore, the Court denies the Defendant's Motion to Exclude Mr. Heikkila as to his derailer testimony.

### c. Horn Opinion (Section 18)

Finally, Mr. Heikkila proposes that Mr. Turk should have been trained to use the Trackmobile's warning horn to give Mr. Burchfield a better chance to avoid the

oncoming collision. (Heikkila Report at 15). The Defendant objects that this opinion "is nothing more than speculation and fails to connect the use of a horn under the circumstances of this case with any industry practices or standards." (Def.'s Br. in Supp. of Def.'s Mot. to Exclude Heikkila, at 14). Although Mr. Heikkila could have done more to show his work for the horn opinion, the Court is nonetheless satisfied that the materials relied upon in preparing his report support this opinion. For example, Morris Draper, a former Barloworld trainer, testified that industry employees, including at General Mills, were trained to sound the Trackmobile horn in case of danger. (Draper Dep. at 97:15-98:12; *see also* Heikkila Report, App'x C at 2 (listing the Draper deposition under the "Materials Reviewed" section)). However, Mr. Turk stated at his deposition that he did not know at the time of the accident that the horn could be used as a warning signal and instead only screamed for Mr. Burchfield to get out of the way. (Turk Dep. at 130:24-132:2; *see also* Heikkila Report, App'x C at 2 (listing the Turk deposition under the "Materials Reviewed" section)). As such, the Court will not exclude Mr. Heikkila's testimony on using the Trackmobile horn as a warning signal.

For the foregoing reasons, the Defendant's Motion to Exclude Mr. Heikkila should be denied.

## B. The Defendant's Motion for Summary Judgment

The Defendant argues that it is entitled to summary judgment by default so long as the Court excludes the standard-of-care testimony of Mr. Gualardo and Mr. Heikkila. (Def.'s Br. in Supp. of Def.'s Mot. for Summ. J., at 10-13.) Without this

testimony, the Defendant contends that the Plaintiff cannot prove the Defendant's negligence, which is a threshold element to its breach of contract claims. (*Id.* at 15.) However, as explained above, the Court has granted the Defendant's request to exclude only Mr. Gualardo's testimony but will permit Mr. Heikkila to offer his standard-of-care opinions at trial. Therefore, this ground for summary judgment necessarily fails.[9]

The Defendant also contends that the Plaintiff's claims are barred under Georgia's vouchment doctrine. (Def.'s Br. in Supp. of Def.'s Mot. for Summ. J., at 16-17). In so arguing, the Defendant incorporates by reference the arguments it presented in its Cross-Motion for Partial Summary Judgment [Doc. 187]. (*Id.*). The Defendants' position on the application of the vouchment doctrine was rejected by the Eleventh Circuit in its most recent order reversing this Court's grant of that motion. *CSX Transp., Inc. v. General Mills, Inc.*, 82 F.4th 1315, 1326-29. Specifically, the Eleventh Circuit held that Georgia's vouchment statute "provides that the vouchee alone is bound from relitigating issues decided in the earlier litigation." *Id.* at 1328. This ground for summary judgment thus fails as well, and the Defendant's Motion for Summary Judgment should be denied.

---

[9] The Defendant also argues that the Plaintiff is precluded from establishing the Defendant's negligence vicariously through Mr. Burchfield's conduct. (Def.'s Br. in Supp. of Def.'s Mot. for Summ. J., at 15-16). The Plaintiff insists that its negligence theory is based not on vicarious liability but on the Defendant's failure to train and supervise its employees. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., at 59). There is no need then for the Court to take action on the Defendant's argument at this time.

### IV.   Conclusion

For the reasons set forth above, the Defendant's Motion in Limine to Exclude Opinion Testimony of Plaintiff's Expert Samuel J. Gualardo [Doc. 235] is GRANTED, and the Defendant's Motion in Limine to Exclude Standard-of-Care Opinion Testimony of Plaintiff's Expert Brian Heikkila [Doc. 236] and Motion for Summary Judgment [Doc. 238] are DENIED. The declarations of John Barnette [Doc. 243-15], Samuel Gualardo [Doc. 243-26], and Brian Heikkila [Doc. 243-28 ] are STRICKEN.

SO ORDERED, this ___21st___ day of June, 2024.


THOMAS W. THRASH, JR.
United States District Judge

28