IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CSX TRANSPORTATION, INC.,

    Plaintiff,

      v.

GENERAL MILLS, INC.,

    Defendant.

CIVIL ACTION FILE
NO. 1:14-CV-201-TWT

## OPINION AND ORDER

This is a breach of contract action. It is before the Court on the Plaintiff CSX Transportation, Inc.'s Motions to Exclude Mark Elrod's Expert Testimony [Doc. 271] and to Exclude Colon Fulk's Expert Testimony [Doc. 274]. For the reasons set forth below, the Plaintiff's Motion to Exclude Mark Elrod's Expert Testimony [Doc. 271] is GRANTED in part and DENIED in part, and the Plaintiff's Motion to Exclude Colon Fulk's Expert Testimony [Doc. 274] is GRANTED in limited part and DENIED in part.

## I.      Background

The facts of this case are well known to the parties, and the Court will summarize only the relevant ones here. On June 5, 2005, General Mills employee Doug Burchfield sustained the partial amputation of both legs in a rail car accident that occurred after he and another employee, Rodney Turk, were moving rail cars on a sidetrack at General Mills's cereal plant in Covington, Georgia. (Doc. 280 at 2). As

a result of the accident, in June 2007, Mr. Burchfield filed a personal injury lawsuit against CSX that ultimately resulted in a verdict against CSX. (*Id.*). The present action followed. The Plaintiff CSX contends that Defendant General Mills caused or contributed to causing the accident in several ways, including permitting employees to operate the Trackmobile and conduct switching operations without ensuring they set and checked handbrakes on the rail cars or used chocks and derailers during switching. (*Id.*) The Plaintiff has moved to exclude the testimony of two of the Defendant's experts who would provide testimony relating to the cause of the Burchfield accident. [Docs. 271, 274].

## II.    Legal Standards

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under that rule, "expert testimony is admissible if (1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014) (quotation marks and citation omitted). The Federal Rules of Evidence require a district judge to undertake a gatekeeping function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "In considering the proffered expert testimony, a trial judge is mindful the burden of establishing qualification, reliability, and helpfulness rests on the

2

proponent of the expert opinion." *Chapman*, 766 F.3d at 1304 (quotation marks and punctuation omitted).

Rule 702 provides that a witness may be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. When assessing a witness's qualifications, the district court must focus on "the matter to which the expert seeks to testify—i.e., 'to the task at hand.'" *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021) (quoting *Daubert*, 509 U.S. at 597). While a witness may be "well-trained, highly educated, and experienced" with an "impressive professional track record," Rule 702 contemplates "a more thorough analysis of whether [the witness] is qualified and competent to testify as an expert *as to the subject matter of his proposed testimony.*" *Jack v. Glaxo Wellcome, Inc.*, 239 F. Supp. 2d 1308, 1316 (N.D. Ga. 2002) (emphasis added). "It is for that reason that 'expertise in one field does not qualify a witness to testify about others.'" *Moore*, 995 F.3d at 854 (quoting *Lebron v. Sec'y of Fla. Dep't of Child. & Families*, 772 F.3d 1352, 1368 (11th Cir. 2014)). The question of whether a proposed witness is qualified to testify as an expert rests within the district court's discretion. *Jack*, 239 F. Supp. 2d at 1314 (citing *Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976)).

Expert testimony is admissible under Rule 702 if, *inter alia*, (1) "the testimony is based upon sufficient facts or data"; (2) "the testimony is the product of reliable principles and methods"; and (3) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. To that end, the district court is tasked with evaluating "whether the reasoning or methodology

underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. *Daubert* sets forth a number of factors relevant to this inquiry, including (1) whether an expert's theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of a scientific technique; and (4) whether a known technique has achieved widespread acceptance in the scientific community. *Id.* at 593-94. These factors are not, the Supreme Court has emphasized, intended to be a "definitive checklist," *id.* at 593; rather, "the law grants the trial judge broad latitude to determine . . . whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case[.]" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999).

Like the Supreme Court, the Eleventh Circuit has advocated a "flexible, context-sensitive application of *Daubert*," recognizing that in certain cases, the question of whether an expert opinion is reliable may turn more on the expert's competency than his methodology. *Adams v. Lab'y Corp. of Am.*, 760 F.3d 1322, 1340 (11th Cir. 2014) (Garza, J., concurring). Thus, "there are instances in which a district court may determine the reliability prong under *Daubert* based primarily upon an expert's experience and general knowledge in the field[.]" *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1336 (11th Cir. 2010). Still, "the qualifications and reliability prongs of *Daubert* are conceptually distinct inquiries that district courts may not collapse into each other." *Moore*, 995 F.3d at 853. "[E]ven in cases where the reliability

4

determination turns primarily on an expert's experience, 'the district court must still determine the reliability of the opinion, not merely the qualifications of the expert who offers it.'" *Adams*, 760 F.3d at 1330 n.13 (quoting *Kilpatrick*, 613 F.3d at 1336). Echoing this principle, the advisory committee note to Rule 702 states:

> [i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it." *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough.").

Fed. R. Evid. 702 advisory committee's note to 2000 amendments. Ultimately, the district court's objective under *Daubert* is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. Additionally, Rule 703 provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703.

### III.   Discussion

### A. Motion to Exclude Mark Elrod's Expert Testimony

The Plaintiff moves to exclude Elrod's testimony on the grounds that (1) he is not qualified to opine on the potential release of the handbrake during the accident

and the condition of the handbrake after the accident; (2) his opinions are not based on reliable scientific methods; and (3) his testimony has the potential to conflate the issues and confuse the jury. (Pl.'s Br. in Supp. of Mot. to Exclude Elrod's Testimony, at 17-28). The Defendant opposes the Motion on the grounds that (1) the Plaintiff's challenge to Elrod's testimony was raised and rejected by this Court in the *Burchfield* litigation; (2) Elrod is qualified by his training as a mechanical engineer; (3) the Plaintiff has failed to establish that the principles and methodology used are unreliable; and (4) Elrod's testimony is not misleading and will help the jury determine whether the handbrake was partially or fully released during the collision. (Def.'s Br. in Opp to Mot. to Exclude Elrod's Testimony, at 1-2, 16-25).[1]

As an initial matter, the Court has not previously considered the challenge to Elrod's testimony that is currently presented. In the first iteration of this case, *Burchfield v. CSX Transp., Inc.*, CSX challenged Elrod's testimony under *Daubert* with regard to a completely different testing protocol on the handbrake. *See Burchfield v. CSX Transp., Inc.*, No. 07-cv-1263-TWT, Doc. 400, 400-2. As the Plaintiff points out, that testing was the "curb impact/bounce test," whereas the present motion addresses Elrod's "pneumatic test" of the subject handbrake. The pneumatic testing was not performed until after discovery closed in the *Burchfield* case and was not disclosed to CSX until after the deadline for filing *Daubert* motions. The Court

---

[1] The Plaintiff also filed a reply brief, [Doc. 277], which the Court has read and considered.

6

also never addressed Elrod's qualifications as CSX did not challenge them at that time. *See id.*, Doc. 400 at 5-16.

## 1. Qualifications

The Plaintiff argues that Elrod is not qualified to serve as an expert witness as to his opinions on (1) whether the collision could have caused the AEX 7136's handbrake to partially release, or (2) whether AEX 7136's handbrake was in the same condition immediately after the accident as it was on secondary inspections conducted a few months later. (Pl.'s Br. in Supp. of Mot. to Exclude Elrod's Testimony, at 18-21; 24). The Court agrees with the Plaintiff as to the first opinion. There is no dispute that Elrod has no experience or training in the railroad industry, he never evaluated a rail car handbrake prior to the testing he conducted for this case, he does not do accident reconstruction, and he never studied railroad derailments; he testified as much during his deposition. (Elrod Dep. (Doc. at 271-3), at 19-22). Although the Defendant argues that Elrod was retained only to examine the mechanics and physics of the handbrake mechanism and, therefore, no expertise in railroad equipment or accident recreation is required, Elrod's own expert report states that he was asked to determine "whether it was possible, given [the handbrake's] design, for the hand brake to partially release *as a result of a crash and derailment of the rail car onto which it was installed.*" (Elrod Expert Report (Doc. 271-1), at 4).[2] Thus, it is apparent that Elrod was retained to testify specifically as to whether a rail car derailment

---

[2] Citations to Elrod's Expert Report reference the PDF pagination.

accident could have caused a partial release of the handbrake. In fact, he stated that his opinion was based on general mechanical engineering principles "as those relate to the foreseeable changes in direction during a rail impact and derailment event," and that he used "testing that would reasonably mimic the direction and severity of forces involved in the crash," despite testifying that he has never studied railroad derailments. (*Id.* at 4-5). Nor does Elrod's CV provide any further support for the Defendant's position that he is qualified to opine on the subject matter at issue here. (*See* Elrod Expert Report, Appx. A. at 20-21). It is plainly apparent that Elrod is an accomplished mechanical engineer, but under *Daubert*, that is not enough. *See Jack*, 239 F. Supp. 2d at 1316 (noting that Rule 702 requires an expert to be qualified to testify "as to the subject matter of his proposed testimony."). The Court will thus grant the Plaintiff's Motion to Exclude Elrod's testimony as to the partial release opinion on qualification grounds. *See Chapman*, 766 F.3d at 1304.

However, the Court finds Elrod to be qualified to opine as to the condition of the handbrake immediately after the accident and several months later. Here, Elrod's expert report states that he was tasked with comparing the condition of AEX's 7136 handbrake and associated rigging on two dates and "render[ing] an independent engineering opinion" as to whether the components were in the same condition on both dates. (Elrod Expert Report, at 4). The Plaintiff does not dispute Elrod's expertise in general mechanical engineering, and this opinion does not call for specialized expertise in rail cars, derailments, or handbrakes. Elrod's CV exhibits

8

more than sufficient experience as a professional mechanical engineer with relevant experience in failure analysis and forensic testing.

### 2. Reliability and Methodology

The Plaintiff also challenges both of Elrod's opinions on reliability grounds. As to the partial release opinion, the Plaintiff argues that Elrod's pneumatic testing made no effort to simulate the forces of impact on the AEX 7136's handbrake during the Burchfield accident and that his testing mostly showed that multiple vertical force applications on the handbrake could achieve a full release, rather than a partial release. (Pl.'s Br. in Supp. of Mot. to Exclude Elrod's Testimony, at 25-27). The Plaintiff also contends that Elrod's opinion on the condition of the handbrake was based on "his review of a handful of pictures," he did not speak with those who had personally inspected the handbrake's condition, and he did not test the AEX 7136's handbrake firsthand. (*Id.* at 25). The Defendant responds that Elrod "straightforward[ly] appli[ed] the scientific method" in conducting the pneumatic testing of the handbrake and that Elrod never intended to simulate the Burchfield accident, instead demonstrating a general physics principle with regard to vertical motion. (Def.'s Br. in Opp. to Mot. to Exclude Elrod's Testimony, at 20-23). Additionally, the Defendant contends that Rule 703 permits experts to rely on the opinions and findings of other experts in their field in forming conclusions. (*Id.* at 24).

Turning first to the partial release opinion, the Court finds that this opinion is not the product of sufficiently reliable methods. Again, as previously explained, the basis of Elrod's opinion was whether the handbrake could partially release "as a

result of a crash and derailment of the rail car onto which it was installed." (Elrod Expert Report, at 4). However, as the Plaintiff points out, Elrod conducted the test by affixing the handbrake to a "test fixture" that, based on the Court's review of the test video, had rubber wheels and significantly less weight than a loaded rail car. (Elrod Expert Report, at 8, 11; *see generally* Test Video (Doc. 271-6)). Although the Defendant contends that Elrod's inquiry was limited to a more generalized testing of the dynamics principles involved in sudden vertical movement on the handbrake, Elrod's own report belies this assertion. In particular, he states that the testing he designed would "reasonably mimic the direction and severity of forces involved in the crash," but gives no explanation for the physical differences between the test fixture he constructed and the loaded AEX 7136 rail car such that the pneumatic testing he conducted could reasonably be expected to "mimic" the forces involved in the accident. (Elrod Expert Report, at 5). Nor does Elrod attempt to explain these differences. Even assuming, as Elrod states, that the mechanical forces underlying both the test setup and the accident itself are the same, given Elrod's lack of justification, the Court cannot say that Elrod's methodology "properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

Applying the *Daubert* methodology factors further bolsters the Court's conclusion. Elrod does not state in his expert report that his pneumatic testing setup has been subjected to peer review or that it has widespread acceptance in the scientific community. *Id.* at 593-94. Nor does he say much at all, really, about the reasoning behind his methodology. He speaks in vague generalities, stating for

example that: "[he] followed a methodology that is . . . typically and customarily followed by engineers who are called upon to investigate events of this nature;" "[he] relied on the generally accepted principles of mechanical engineering relevant to the motion of moving bodies as those relate to the foreseeable changes in direction during a rail impact and derailment event;" and that his methodology "is the generally accepted methodology used by engineers called upon to analyze mechanical devices." (Elrod Report, at 4-5). None of these statements explain the reasoning behind the testing setup Elrod chose or how it "reasonably mimic[s]" the forces involved in the Burchfield accident. (*See id.* at 5). Further, Elrod failed to provide a numerical report of how many times his test successfully resulted in a partial release of the handbrake and how many times the test was performed. It is difficult for the Court to assess the error rate of his methodology without that information. *See Daubert*, 509 U.S. at 593-94. Therefore, the Court cannot conclude that Elrod's pneumatic testing methodology was scientifically valid or reliable, and the Court will exclude his partial release opinion on this alternative basis as well. *See id.* at 592-93.

The Court next turns to Elrod's opinion on the condition of the handbrake. The Court finds Elrod's comparative analysis of the condition of the handbrake to be based on reliable methodology. The Plaintiff's argument takes issue with Elrod's review of and reliance on prior inspections and photos of the handbrake, but as the Defendant points out, Rule 703 permits such reliance. The Plaintiff does not appear to dispute the underlying inspections and photos, which Elrod reproduced in his report. In his report, Elrod explains the differences in the handbrake's position during the four

different inspections conducted by Gary Wolf, David Engle, and Brian Nutt, and provides a possible explanation for the discrepancies between the June and August inspections and the September and October ones—the replacement of the AEX 7136's brake shoes. (Elrod Report, at 13-16). In the Court's view, this type of analysis is one in which the Court may rely "primarily upon [the] expert's experience and general knowledge in the field" of mechanical engineering as support for the reliability of his opinion. *See Kilpatrick*, 613 F.3d at 1336. Elrod does not simply regurgitate the prior inspection reports but explains that, based on his expertise:

> [i]f the geometry and condition of handbrake and associated rigging had been the same, the fouling condition should have been reproduced during these inspections. The principles of physics and engineering did not change between August and September of 2005 . . . [t]here are many components involved in the geometry of the braking system (the length of the chains connected to the bell crank, the thickness of the brake pads, the angle of the bell crank, etc.), and the available data does not indicate which component(s) changed or how.

(Elrod Report, at 16). The Court is satisfied that this meets *Daubert*'s requirements for reliability with regard to experts who rely on their experience for reliability purposes. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendments (stating that, under these circumstances, the witness must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").

### 3. Tendency of Elrod's Condition of the Handbrake Opinion to Confuse the Jury

Finally, the Plaintiff argues that Elrod's condition of the handbrake opinion may confuse the jury if the Defendant challenges Mr. Wolf's inspection at trial, on

which Elrod relied, because Elrod has no personal knowledge of rail cars or handbrakes. (Pl.'s Br. in Supp. of Mot. to Exclude Elrod's Testimony, at 28). The Defendant is correct that the Plaintiff misunderstands the substance of Elrod's opinion. First, the Plaintiff does not point to any specific part of Elrod's opinion that would mislead the jury and relates only a hypothetical situation that hinges on evidence not presently before the Court in this motion. Second, as the Court previously explained, Elrod's lack of expertise in railroad equipment is not critical to this opinion, which requires only an expertise in general mechanical engineering. *See infra* section III.A.1. For these reasons, the Court finds Elrod's expert testimony as to the altered condition of the AEX 7136's handbrake during Mr. Wolf, Mr. Engle, and Mr. Nutt's inspections to be admissible under *Daubert* and the Court will therefore deny the Plaintiff's Motion to Exclude as to this opinion.

## B. Motion to Exclude Colon Fulk's Expert Testimony

In its Motion, the Plaintiff challenges three of Fulk's expert opinions: (1) his standard of care opinion for industry switching; (2) his opinion that the handbrake on the AEX 7136 was defective; and (3) his opinion that the defective handbrake and the Plaintiff's conduct caused the accident and not the Defendant's conduct. (Pl.'s Br. in Supp. of Mot. to Exclude Fulk's Testimony, at 2).

The Plaintiff does not challenge Fulk's qualifications as an expert in this case, and rightfully so. As detailed in his expert report and CV, Fulk has held positions with two different railroad companies as a conductor, fireman, brakeman, locomotive engineer, District Road Foreman of Engines, and Division Road Foreman of Engines

13

over the course of two decades. (Fulk Expert Report, Ex. A, (Doc. 274-2) at 21).[3] For the last 30 years, he has also done railroad consulting in "all aspects of train operations." (*Id.*). He is a member of several professional railroading organizations, is qualified on the operating rules for several railroad companies, including CSX, and has determined the cause of over 1000 railroad accidents. (*Id.*). Fulk also has expertise in railroad brake usage and in training railroad employees. (*Id.* at 22). The Court is thus satisfied that Fulk's opinions are admissible under the qualifications prong of Rule 702. *Chapman*, 766 F.3d at 1304.

In preparing his expert report, Fulk conducted a site inspection at the General Mills plant in Covington and reviewed a list of 38 materials, including, *inter alia*, depositions, several railroad companies' safety handbooks, other expert reports in this action, CSX's operating rules and safety handbook, and the Barloworld training materials and Trackmobile instruction manual. (Fulk Expert Report, at 10-11). Fulk presented his opinions in nine detailed yet overlapping sections, and the Plaintiff argues three of the opinions are either unreliable or have the potential to confuse the jury. Because the Plaintiff presents distinct challenges to each of the three opinions, the Court will address each opinion in turn.

## 1. Standard of Care Opinion

The Plaintiff argues that Fulk's standard of care opinion is unreliable, unhelpful, and should be excluded for three main reasons: (1) Fulk did not review the

---

[3] Citations to Fulk's Expert Report reference the document's PDF pagination.

"materials on which [the Defendant's] training and supervision policies were based";
(2) Fulk opined that the Barloworld training met or exceeded the standard of care
while also stating that components of it should not have been followed; and (3) Fulk
failed to consider evidence that the Defendant was not following its own training and
policies at the time of the accident. (Pl.'s Br. in Supp. of Mot. to Exclude Fulk's
Testimony, at 19-24; Pl.'s Reply Br. in Supp of Mot. to Exclude Fulk's Testimony, at
1-2). The Defendant responds that Fulk assessed its conduct under the standard of
care for industry switching based on his expertise and not on its compliance with its
own policies or the Barloworld training. (Def.'s Br. in Opp. to Mot. to Exclude Fulk's
Testimony, at 9-10). The Defendant also argues that Fulk's testimony is reliable
because he explains how his decades of experience led him to the opinions he made
and the remainder of the Plaintiff's criticisms go to the weight the testimony,
rather than its admissibility. (*Id.* at 10-15).

The Eleventh Circuit has held that the district court may sometimes determine
the reliability of an expert's testimony under *Daubert* based on the expert's
experience and knowledge in his field. *Kilpatrick*, 613 F.3d at 1336. One such
instance is standard-of-care testimony, which generally arises from professional,
empirical judgment rather than scientific study. *See, e.g.*, *Adams*, 760 F.3d at 1330
(noting a standard of care expert's "application of her extensive, relevant experience
contributed to the reliability of her methodology"); *Anderson v. Techtronic Indus. N.
Am., Inc.*, 2015 WL 12843836, at *4 (M.D. Fla. Apr. 14, 2015) ("The type of opinion at
issue here—essentially a failure to adhere to a certain standard of care—is precisely

the type of opinion where experience may be appropriately relied upon."); *see also*
*Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 982 (6th Cir.
2004) (holding the district court abused its discretion in excluding a doctor's standard
of care testimony that was "supported by extensive relevant experience"). Moreover,
"[i]t is true that relevant testimony from a qualified expert is admissible only if the
expert knows of facts which enable him to express a reasonably accurate conclusion
as opposed to conjecture or speculation." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662
(11th Cir. 1988). However, "as long as a logical basis exists for an expert's opinion . . .
the weaknesses in the underpinnings of the opinion[] go to the weight and not the
admissibility of the testimony." *Id.* at 663. Thus, "[v]igorous cross-examination,
presentation of contrary evidence, and careful instruction on the burden of proof are
the traditional and appropriate means of attacking shaky but admissible evidence."
*Daubert*, 509 U.S. at 596.

   As an initial matter, the Court takes the opportunity the Plaintiff has
presented to reiterate that the standard of care issue "cannot be reduced to whether
or not General Mills followed an instruction manual." *CSX Transp., Inc. v. General
Mills, Inc.*, 2024 WL 3089652, at *2 (N.D.Ga. June 21, 2024). The bulk of the
Plaintiff's challenges to Fulk's standard of care opinions hinge on its assumption that
the Defendant's switching training and policies were synonymous with, or at least
inexorably linked with, the applicable standard of care. For example, the Plaintiff
first takes issue with the fact that Fulk allegedly did not evaluate the actual content
of the Barloworld training that the Defendant provided or the Defendant's internal

16

policies in determining that the Defendant's training met the standard of care for industry switching. This argument only holds water if one assumes that the content of the Defendant's training and policies defines the standard of care, and the Court has already held that it does not. Instead, the Defendant's training and policies for industry switching are just one factor among several to be considered.

What the Plaintiff fails to acknowledge is that Fulk's use of the word training also encompasses on the job training that the Defendant's employees received, such as the training Burchfield was conducting with Turk at the time of the accident, and his consideration of the Defendant's policies did not solely include its written policies. (*See* Fulk Expert Report, at 14-15). Notwithstanding the fact that Fulk did actually review the Barloworld training materials, (*see id.* at 11, 16-18), Fulk opined that it was common in the industry and consistent with the standard of care to have experienced industry switchmen train newer workers on the job. (*Id.* at 14 ("Mr. Turk was under the direct supervision of Mr. Burchfield . . . [t]his method of training is consistent with training programs in the rail industry as well."). The Plaintiff's contention that Fulk's opinion is unreliable because he did not expressly evaluate the contents of the Defendant's training in forming his standard of care opinions goes to the weight of his testimony rather than its admissibility and is a topic best suited for cross-examination. *See Daubert*, 509 U.S. at 596.

Contrary to the Plaintiff's contentions, Fulk devoted a great deal of his expert report to delineating the applicable standard of care to industry switching employees, opining that:

- "It is therefore inconsistent with the standard of care and unreasonable for CSX to contend that industry employees like Burchfield and Turk would or should be trained to identify this type [of] defect or prevent the danger that it gave rise to. By contrast, railroad employees have the expertise and the duty to identify and correct this type of defect in the hand brake system."

- "The standard of care varies greatly between an industry like GMI, a company with expertise in making cereal and not moving railcars as is the case with a rail company like CSX . . . The law recognizes the railroad industry's superior knowledge and responsibility for the handling and maintenance of railcars . . . By contrast GMI is not a railroad, and it is not reasonable to expect GMI employees to perform complex railroad operations, or to identify anomalous defects that are hidden to the layperson.

- "Mr. Turk was under the direct supervision of Mr. Burchfield. The authorization for movement of the Trackmobile came from Mr. Burchfield. This method of training is consistent with training programs in the rail industry as well."

- "The standard of care in the railroad industry is for experienced railroad personnel to share knowledge and experience. In my own experience working in the railroad industry, I have shared knowledge related to the safe and efficient movement of railcars with various industry employees. On numerous occasions I have . . . instructed them in the proper application of railcar movements. This is particularly common on an industry sidetrack where railroad employees will also be switching."

(Fulk's Expert Report, at 14-18). Fulk's expertise in railroad switching training procedures and his general familiarity with the Barloworld training were sufficient for him to express a "reasonably accurate conclusion" that, in his opinion, the Defendant's training protocols (both written and unwritten) met the standard of care. *See Jones*, 861 F.2d at 662.

Next, and relatedly, the Plaintiff criticizes as unreliable Fulk's opinion that the Defendant met the standard of care by providing Barloworld training to its

employees because he also testified that parts of that training, such as chocking rail car wheels mid-switching, should not have been followed. Again, the Barloworld training is not the guiding light on the standard of care issue that the Plaintiff makes it out to be. Fulk clearly explained that his opinion was based on his years of experience and expertise in railroad operations. The fact that he apparently agreed with parts of the Barloworld training and disagreed with other parts, based on his extensive experience, does not make his standard of care opinion per se unreliable. Instead, this contention goes towards the weight of Fulk's testimony, and it will be the jury's decision as to whether the Barloworld training materials or Fulk's opinion testimony are owed more weight. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) ("[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence."). The Plaintiff's argument that this allegedly contradictory testimony will confuse the jury fails for the same reason—there is nothing confusing about Fulk explaining why he disagreed, based on his experience, with certain components of the Barloworld training materials that the Defendant provided.

Finally, the Plaintiff's argument that Fulk failed to consider evidence that the Defendant was not following its own training and supervision policies at the time of the accident fails for the same reasons. Fulk could reliably form a standard of care opinion in compliance with *Daubert* based on his experience without expressly considering this evidence, and his alleged failure goes only to the weight of his testimony rather than its admissibility. His failure to consider the contradictory

19

evidence could pose a reliability problem only if one assumes that the Defendant's training and policies exclusively determine the applicable standard of care, but as the Court has tirelessly explained, they do not. In sum, "[t]hat the [Defendant's] experts['] conclusions are contrary to the [Plaintiff's] proposed application of the law to the facts of the case does not mean that the methods and reasoning employed by [the Defendant's] experts are unreliable or unreasonable." *Home Design Servs. Inc. v. Turner Heritage Homes, Inc.*, 2010 WL 8685141, at * 1 (N.D. Fla. July 19, 2010). The Plaintiff's Motion to Exclude Fulk's Testimony will thus be denied as to Fulk's standard of care opinions.

### 2. Defective Handbrake and Partial Release Opinions

The Plaintiff challenges Fulk's opinions that the handbrake on the AEX 7136 was defective and that it partially released during the collision on two grounds: (1) the opinions are needlessly cumulative; and (2) Fulk based his opinions entirely on a review of deposition testimony, inspections of the handbrake, and other experts' reports. (Pl.'s Br. in Supp. of Mot. to Exclude Fulk's Testimony, at 24-26). The Defendant responds that Fulk properly relied on testing and expert reports prepared by others in forming his opinions and that the differing perspective of Fulk's opinions compared to other experts' opinions prevent it from being cumulative. (Def.'s Br. in Opp. to Mot. to Exclude, at 15-18).

The Court will address the second contention first. The Federal Rules of Evidence permit Fulk to base his opinion as to whether the handbrake was defective and whether it was partially released on the observations, testing, and inspections of

other experts, so long as he relied on his own experience in analyzing those materials and cogently explained how his experience led him to his conclusions. Fed. R. Evid. 703. Fulk has done so here. He does not "merely repeat[] and summarize[] those opinions," as the Plaintiff alleges, but applies his own knowledge to explain how the fouling condition on the AEX 7136 would have prevented the application of sufficient force on the rail car's braking system. (*See* Fulk Expert Report, at 11-12; Pl.'s Br. in Supp. of Mot. to Exclude Fulk' Testimony, at 23). Fulk further explained how rare the purported defect was based on his experience. (Fulk Expert Report, at 14). However, Fulk's testimony as to the partial release condition must be excluded to the extent that his opinion relies on Elrod's pneumatic testing and resulting expert report, which is excluded for the reasons explained in Section A. In his report, Fulk adopted Elrod's conclusion that the AEX 7136's handbrake became partially released as a result of his review of Engle's and Elrod's expert reports. Thus, Fulk may opine on the partial release condition to the extent that his opinion can be supported by admissible evidence other than Elrod's expert report, testimony, and pneumatic testing.

Second, the Court does not find Fulk's opinions as to the handbrake to be so cumulative that they must be excluded. District courts can exclude expert testimony under Rule 403 as needlessly cumulative only when that danger outweighs the probative value of the testimony. Fed. R. Evid. 403. And "the rejection of expert testimony is the exception rather than the rule." *Moore*, 995 F.3d at 850. Although there are several experts who may testify at trial about the alleged defect in the

handbrake, these experts have "differences in their perspectives and experiences" which makes exclusion inappropriate. *Does 1-4 v. Red Roof Inns, Inc.*, 688 F.Supp.3d 1364, 1371-72 (N.D.Ga. 2023) (quotation marks and citation omitted). Elrod is a mechanical engineer and Engle is an expert in rail car mechanical systems, including brakes, whereas Fulk's expertise is in railroad operations. (Elrod Expert Report, Appx. A. at 20; Engle Expert Report, (Doc. 274-20), at 1-2; Fulk Expert Report, at 4). Additionally, a cumulativeness challenge is speculative at this stage and may be more appropriately raised at trial and "in the proper context." *See Does 1-4*, 688 F.Supp.3d at 1372 (quotation marks and citation omitted).

Accordingly, the Plaintiff's Motion to Exclude Fulk's Testimony as to his handbrake and partial release opinions will be granted only to the limited extent that Fulk's partial release opinion relies on Elrod's expert report, testimony, and testing, and will be denied on all other grounds.

### 3. Causation Opinion

Lastly, the Plaintiff challenges Fulk's opinion that the Burchfield accident was ultimately caused by the defective handbrake and the Plaintiff's failure to identify the defect and not by the failure of the Defendant to properly train its employees. The Plaintiff argues that these opinions: (1) are based on the "fundamental[] flaw[s] and/or cumulative opinions" that the Court has already addressed, and (2) rely on an unsupported contention that the Plaintiff had legal duties that it did not have. (Pl.'s Br. in Supp. of Mot. to Exclude Fulk's Testimony, at 26-27). The Defendant contends

22

that the Plaintiff misconstrues Fulk's causation opinions. (Def.'s Br. in Opp. to Mot. to Exclude Fulk's Testimony, at 18-19).

Because the Court has already addressed and largely rejected the Plaintiff's prior challenges to Fulk's opinions, its challenge to his causation opinions on the alleged flaws and cumulativeness of those opinions necessarily fails. The Plaintiff's second challenge fails for the simple reason that Fulk did not opine on any legal duties owed by the Plaintiff, contrary to the Plaintiff's contentions. Fulk instead opined on what he felt was the standard of care for industry switching owed by both the Defendant and the Plaintiff and whether he felt that standard of care was met with regard to the Burchfield accident. This is a perfectly acceptable topic for an expert's testimony. *Haines v. Webb*, 2014 WL 12828962, at *9 (N.D.Ga. Sept. 26, 2014) ("An expert may offer opinions as to the applicable standard of care and what conduct he believes fell short of that standard and the jury should be instructed that they are ultimately to make the decisions concerning causation and negligence.") (collecting cases and citing *Ricker v. Southwind Trucking Inc.*, 2006 WL 5157692, at *8 (N.D.Ga. July 13, 2006) ("Mr. Morgan's expert report indicates that Mr. Morgan is simply offering his opinion as to what he believes the applicable standard of care is, and the reasons that he believes Defendants' conduct fell short of that standard of care. The Court can, and will, resolve any lingering concerns about 'ultimate issues for the jury' by instructing the jury that they are ultimately to make the decisions concerning causation and negligence.").

The *Montgomery* case the Plaintiff cites does not persuade the Court otherwise. There, the Eleventh Circuit held that "[a]n expert may testify as to his opinion on an ultimate issue of fact . . . [a]n expert may not, however, merely tell the jury what result to reach. A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (citation omitted). In his expert report, Fulk opined on the ultimate issue of causation with thorough explanations based on his decades of experience and expertise in railroad operations, explaining how he felt that the accident was owed to a defect in the AEX 7136's handbrake and would not have been avoided with additional training. (Fulk Expert Report, at 15-19). Therefore, he did not "merely tell the jury what result to reach." *Id.* Nor did Fulk opine on the legal implications of the alleged failures he attributed to the Plaintiff; he opined on the factual issue of causation. *See R.W. v. Bd. of Regents of the Univ. Sys. Of Ga.*, 114 F. Supp. 3d 1260, 1274-75 (N. Ga. 2015). If the Court were to accept the Plaintiff's argument that standard of care testimony necessarily equates to testimony on the parties' legal duties, no expert testimony on the standard of care issue would be admissible, including that of the Plaintiff's own experts. (*See* Pl.'s Reply in Supp. of Mot. to Exclude, at 9 (arguing that "a standard of care is what creates a legal duty to comply with that standard under Georgia law."). At trial, the Court will instruct the jury to make the ultimate decision as to the negligence and causation issues. The Plaintiff's Motion to Exclude Fulk's Testimony will therefore be denied as to Fulk's causation opinion.

IV.   Conclusion

For the aforementioned reasons, the Plaintiff's Motion to Exclude Mark Elrod's Expert Testimony [Doc. 271] is GRANTED in part and DENIED in part, and the Plaintiff's Motion to Exclude Colon Fulk's Expert Testimony [Doc. 274] is GRANTED in part and DENIED in part.

SO ORDERED, this ___16th___ day of July, 2024.

THOMAS W. THRASH, JR.
United States District Judge